**Harold Guy HUNT, Petitioner,**

v.

**Kenneth TUCKER, Winfred Smithson, John S. Nettles, Judith C. O'Connor, and Louie S. Grimes, Respondents.**

No. CV–94–N–1851–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

Jan. 9, 1995.

As Corrected March 9, 1995.

George Beck, Montgomery, AL, William N. Clark, Redden Mills & Clark, Birmingham, AL, for petitioner.

P. David Bjurberg, Rosa H. Davis, Stacey S. Houston, James H. Evans, Atty. Gen., Office of the Atty. Gen., Montgomery, AL, for respondents.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

This is a petition for the writ of habeas corpus filed by a person in custody[1] of the State of Alabama following a criminal convic-tion in the courts of that state. 28 U.S.C. § 2254.

## I. Introduction.

In this petition Harold Guy Hunt, the former governor of the State of Alabama (hereinafter "the petitioner" or "Mr. Hunt"), asserts that he was charged, tried, convicted, sentenced and removed from office by the use of procedures that did not conform to the standards of the United States Constitution. The court, after full consideration of the for-ty-three volume record, the controlling law, and some two hours of oral argument, has concluded: (1) in a single instance Mr. Hunt is correct; (2) applicable habeas corpus law does not authorize this court to correct the error; and (3) that the petition is due to be denied in all respects.

The writ of habeas corpus, the "great writ," has its roots in the common law of England[2] and, by the summer of 1787, was so well established that the framers of our Constitution believed it unnecessary to affir-matively authorize it. Cechariah Chafee, Jr.,

---

1. Following his conviction, the petitioner was placed on probation with conditions and fined a total of $10,000.00. He is in "custody pursuant to a judgment of a state court" within the mean-ing of 28 U.S.C. § 2254(a). *See Coronado v. United States Bd. of Parole*, 540 F.2d 216, 217 (5th Cir.1976) (sentence of probation is sufficient to satisfy the custody requirement of the habeas statute). For habeas corpus purposes "custody" does not mean that one must actually be con-fined to prison. A person on parole or probation is in custody. *Jones v. Cunningham*, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

2. By the Statute of Westminster, ca. 14th centu-ry, the people of England were guaranteed "That no man of what estate or condition he be, shall be put out of his lands or tenements, nor taken nor imprisoned, nor disinherited, nor put to death, without being brought to answer by due process of law." By the seventeenth century the writ of habeas corpus, by which such rights had been enforced, was in need of repair because it had proven ineffective in the face of the absolute and arbitrary authority exercised by both the Court of Star Chamber and the Court of High Commission. Thomas M. Cooley, Constitutional Limitations 343 (The Legal Classics Library 1987) (1868). Typically, the return to a writ of habeas corpus inquiring into the detention of one under a decree of either court would recite only that the prisoner "[was] detained by a warrant from the privy council, informing him of no particular cause of imprisonment, but that they were committed by the special command of his Majesty." *Id.* The courts were either unable or unwilling to act in the face of such a return. *Id.* The writ was restored to its former stature by passage of the Habeas Corpus Act of 1679. *Id.* at 344. The act provided no new rights but fur-nished the means to enforce those which existed before. Professor Cooley summarized the provi-sions of the act.

> That the writ of *habeas corpus* might be issued by any court of record or judge thereof, either in term time or vacation, on the application of any person confined or of any other person for him, the application to be in writing and on oath, and with a copy of the warrant of com-mitment, if any, attached, if procurable; the writ to be returnable either in court or at chambers; the person detaining the applicant to make return to the writ by bringing up the prisoner with the cause of his detention, and the court or judge to discharge him, unless the imprisonment appeared to be legal, and in that case to take bail, if the case was bailable; and performance of all these duties was made com-pulsory, under heavy penalties.

*Id.* The act did not, by its terms, apply to the American colonies but was adopted either ex-pressly or by acquiescence. American legislation has been based upon the English act. *Id.* at 345.

The Congress provided for federal habeas cor-pus review in the Judiciary Act of 1789, Ch. 20, § 14, 1 Stat. 81, and the Habeas Corpus Act of 1867, Ch. 28, § 1, 14 Stat. 385, now 28 U.S.C. §§ 2241–2255.

*The Most Important Human Right in the Constitution,* 32 B.U.L.Rev. 143, 146 (1952). They did, however, ensure that the people would not be deprived of its benefits. "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The writ of "[h]abeas corpus, as an instrument to protect against illegal imprisonment, is written into the Constitution. Its use by courts cannot in my judgment be constitutionally abridged by Executive or by Congress." *Johnson v. Eisentrager,* 339 U.S. 763, 798, 70 S.Ct. 936, 954, 94 L.Ed. 1255 (1950) (Black, J., dissenting).

■■■ All federal constitutional rights that have been incorporated into the Fourteenth Amendment Due Process Clause and thereby made applicable to the states are cognizable on a petition for the federal writ of habeas corpus. *Brown v. Allen,* 344 U.S. 443, 464, 73 S.Ct. 397, 411, 97 L.Ed. 469 (1953). Habeas corpus review is essentially an examination of the process employed by the state courts which resulted in the conviction and sentence of the petitioner.

> [A]n inquiry whether an exercise of power such as detention, is "lawful" could meaningfully address itself ... not so much to the substantive question whether truth prevailed but to the institutional or functional one, whether the complex of arrangements and processes which previously determined the facts and applied the law

validating detention was adequate to the task at hand.

Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441 (1963). In other words, the guilt or innocence of the petitioner is not at issue when the federal judge considers a state prisoner's petition for a writ of habeas corpus.[3]

The Supreme Court, as recently as 1993, confirmed that a claim of "actual innocence" on the part of a habeas petitioner does not state a constitutional claim. *Herrera v. Collins,* —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[A] claim of 'actual innocence' is not itself a constitutional claim." *Id.* at ——, 113 S.Ct. at 862. "[N]ewly discovered evidence relevant only to a state prisoner's guilt or innocence is not a basis for federal habeas corpus relief." *Id.* at ——, 113 S.Ct. at 875.) (Scalia, J., concurring). Consequently, this court does not reach the question of whether Mr. Hunt was guilty or not guilty of the offense for which he was convicted. The evidence which was presented against him has been detailed in this opinion, and others, if they choose to do so, may form their own opinions about his conduct in the Office of Governor of the State of Alabama. What the court has done is apply the applicable law to the record which was presented to it. The Constitution and the law require it and the court can do no less. It can do more.[4]

In Section II. of this opinion, the court describes the background of this petition,

---

**3.** The concept that a federal habeas court does not take into account whether the state courts correctly determined that the petitioner was guilty of the offense charged is not universally applauded. Twenty-five years ago some members of the federal judiciary thought it should be otherwise.

> After trial, conviction, sentence, appeal, affirmance, and denial of certiorari by the Supreme Court, in proceedings where the defendant had the assistance of counsel at every step, the criminal process, in Winston Churchill's phrase, has not reached the end, or even the beginning of the end, but only the end of the beginning. Any murmur of dissatisfaction with this situation provokes immediate incantation of the Great Writ, with the inevitable initial capitals, often accompanied by a suggestion that the objector is the sort of person who

> would cheerfully desecrate the Ark of the Covenant. My thesis is that, with a few exceptions, convictions should be subject to collateral attacks only when the prisoner supplements his constitutional plea with a colorable claim of innocence.

Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi. L.Rev. 138, 142 (1970). See also, *Wiman v. Powell,* 293 F.2d 605, 609 (5th Cir.1961) (Hutcheson, J. concurring) ("It may well be that when a defendant seeks to invoke in his favor these ideas of fair play, he must first lay the predicate of showing his innocence of the crime charged.").

**4.** "Bad men, like good men, are entitled to be tried and sentenced in accordance with law...." *Green v. United States,* 365 U.S. 301, 309, 81 S.Ct. 653, 658, 5 L.Ed.2d 670 (1961).

demonstrating how it reached the posture in which we find it. In Section IV.A., the court discusses the claim that the petitioner was a victim of the Attorney General's vindictive and invidious decision to single him out for prosecution in retaliation for his having exercised political and associational rights under the First Amendment and explains why Mr. Hunt cannot establish a prima facie case of selective and vindictive prosecution. In Section III., the court will describe the evidence which was presented against the petitioner during his trial and, in Section IV.E.1., will demonstrate why that evidence was sufficient, in a constitutional sense, to justify the jury in finding Mr. Hunt guilty of the crime charged against him. The court will examine the so-called "judicial ex post facto" claims in Section IV.B. and in Section IV.B.2. will demonstrate that the Alabama Supreme Court decision regarding the meaning of the "obtains direct personal financial gain" language of the Alabama Ethics Act was neither "unexpected" nor "indefensible" and did not have the effect of reviving an expired statute of limitations or of violating the petitioner's substantive right to due process. The court, in Section IV.B.3., will explain why the same is true with the jury instructions. In Section

IV.D., the court examines the indictment on which the petitioner was required to stand trial, explains why it was not authorized by preexisting Alabama law, and finds that, though the indictment was entirely defective, it is not a proper subject, under federal law, over which this court sitting as a habeas corpus court has the power to correct. The court will examine the petitioner's remaining claims in Sections IV.E.2.a., IV.E.2.b., IV. E.3. and IV.E.4. and will explain why his rights were not violated as claimed.

## II. Background.

On December 28, 1992, a grand jury sitting in the Circuit Court of Montgomery County, Alabama, returned a thirteen-count indictment charging Harold Guy Hunt, the then sitting governor of the State of Alabama, with using his office for personal gain in violation of Alabama Code Section 36–25–5 (1975) (Count One),[5] theft of property in violation of Alabama Code Section 13A–8–3 (Counts 2, 3, 5, 6, 8 and 9),[6] receiving stolen property in violation of Alabama Code Section 13A–8–17 (1975) (Counts 4, 7 and 10),[7] and conspiracy to commit theft of property in violation of Alabama Code Section 13A–4–3 (1975) (Counts 11, 12 and 13).[8] Counts Two

---

5. Section 36–25–5 provides in pertinent part, "No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law." Count One of the indictment charged:

The Grand Jury of said county charge that before the finding of this indictment Harold Guy Hunt, alias H. Guy Hunt, alias Guy Hunt whose name is otherwise unknown to the Grand Jury, while a public official or employee, to wit: the Governor of the State of Alabama, did use an official position or office, to wit: the Office of the Governor of the State of Alabama, to obtain direct personal financial gain, to wit: two hundred thousand dollars ($200,000) in lawful currency and/or coinage of the United States of America and/or checks, a better description of which is unknown to the Grand Jury, for himself or his family or any business with which he or a member of his family is associated, said use and gain not being specifically authorized by law in violation of Section 36–25–5 of the Code of Alabama, against the peace and dignity of the State of Alabama.

6. Section 13A–8–3 provides, in pertinent part that "[t]he theft of property which exceeds

$1,000.00 in value, or property of any value taken from the person of another, constitutes theft of property in the first degree." Counts Two and Three each charged Mr. Hunt with the theft of $200,000.00 from the "Hunt Transition and Inaugural Fund, Inc." Count Nine charged theft of the same amount from the "1987 Alabama Inaugural Committee." Counts Five, Six, and Eight each charged theft of $200,000.00 from the State of Alabama.

7. In pertinent part, Section 13A–8–17 provides, "Receiving stolen property which exceeds $1,000.00 in value constitutes receiving stolen property in the first degree." Count Four charged receipt of $200,000.00 which had been stolen from the "Hunt Transition and Inaugural Fund, Inc." Count Seven charged receipt of the same amount, the property of the State of Alabama. Count Ten charged that the petitioner received $200,000.00 which had been stolen from the "1987 Alabama Inaugural Committee."

8. Section 13A–4–3 provides that "A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons

through Thirteen were dismissed prior to trial because those charges were brought without the applicable period of limitations.[9]

The petitioner entered a plea of not guilty as to Count One and the trial was begun before a jury on April 12, 1993. On April 22, 1993, the jury returned a verdict of guilty as charged in Count One. The Alabama Court of Criminal Appeals affirmed on December 13, 1993, and denied a petition for rehearing on January 12, 1994. *Hunt v. Alabama,* 642 So.2d 999 (Ala.Crim.App.1994) (per curiam). The Alabama Supreme Court granted Mr. Hunt's petition for the writ of certiorari, affirmed the conviction in all respects, and denied a petition for rehearing. *Ex parte Hunt,* 642 So.2d 1060 (Ala.1994) (per curiam).[10]

After a thorough review of the trial record and the briefs of counsel, the court conducted a hearing on November 29, 1994, for the purpose of receiving argument only. The court declined, at that time, to receive any evidence.[11] Now, upon further review of the entire record, the court has determined that the petitioner is not entitled to an evidentiary hearing on any issue and that each claim raised by him can and should be determined upon the state court record alone.

### III. The Facts.

The petitioner was elected Governor of the State of Alabama on November 4, 1986, and, soon thereafter, a committee to oversee transitional and inaugural matters was formed.[12] Mr. John Grenier, a political associate of the petitioner, retained Ms. Judy Pittman to act as the Executive Director of the Inaugural Committee. (R. 37, p. 818)[13] According to Ms. Pittman, the goals of the Inaugural Committee "were to raise funds to pay for the Inauguration and the transition of this government and to pay for the activities ... surrounding the Inauguration ... and to raise money for the political account." (R. 37, p. 822)

Mr. James W. Wilson, Jr., was named Chairman of the Inauguration Committee. Seemingly, his primary function was to raise the funds referred to by Ms. Pittman. Mr.

---

does an overt act to effect an objective of the agreement."

9. Section 15–3–1 provides that "[t]he prosecution of all felonies ... must be commenced within three years after the commission of the offense."

10. Mr. Justice Maddox, who was not accounted for when the Supreme Court issued its majority opinion, filed a separate dissent several weeks after the court denied Mr. Hunt's petition for rehearing. However, his dissent does not appear in the official publication of the court's opinion and is not included on either Westlaw or Lexis. Page numbers in the dissenting opinion suggest that it was intended to follow the majority opinion in sequence. For example, the last page of the majority opinion is number 25 and the first page of the dissent is number 26. Justice Maddox's dissent, in its entirety, is attached to this opinion as Appendix D.

11. At the beginning of the hearing, the petitioner moved the court to grant an evidentiary hearing on the issue of selective prosecution and offered the testimony of Michael Wayne Pruett, the chief deputy sheriff of Cullman County, Alabama. The petitioner stated that Deputy Pruett would, if called, testify that he attended a meeting in the office of Attorney General Jimmy Evans in the summer of 1992 in which Mr. Evans referred to Mr. Hunt in the most derogatory of terms, suggesting an improper motive for the prosecution which has become the subject of this petition.

Counsel for the State of Alabama protested that they were surprised by the offer of Deputy Pruett's testimony and requested an opportunity to prepare before any hearing. The court directed the petitioner to submit Deputy Pruett's affidavit so that it might see specifically what he would say, if allowed to testify. Mr. Pruett, however, declined to provide any evidence in the absence of a subpoena and the court authorized the petitioner to issue a subpoena and to take his deposition. That deposition was filed on December 13, 1994. As will be noted, the respondents have filed a number of affidavits countering Pruett's testimony.

12. The "facts" as set out here are gleaned from the trial record. More appropriately, they should probably be referred to as the "evidence." Where this court's review of the evidence is in conflict with the findings of the Alabama appellate courts, this court has deferred to the findings of those courts except where one of the conditions of 28 U.S.C. § 2254(d) has been found.

13. The state court record in this matter is in forty-three bound volumes consisting of forty-one sequentially numbered volumes and two additional bound volumes. References to the record will be by citing the volume number followed by the page reference. For example, "R. 37, p. 818," refers to Volume 37 at page 818. Volumes in the supplemental record will be cited as "S.R."

Wilson identified a "mailgram" sent by Mr. Hunt to potential "Finance Committee" members on December 17, 1986, which stated:

> Dear _____, using this means (sic) reaching you as quickly as possible, request your immediate help in fundraising efforts to underwrite costs of all Inaugural and transition team expenses. No taxpayers' money is being used. My Chairman of the Inauguration, Jim Wilson, has detailed letter arriving at your office tomorrow outlining Finance Committee members' responsibilities and what you can expect in return from us. Am only asking trusted and valued friends such as you to assist in this critically important effort. Hope with all my heart I can count on you to help. At earliest date after Helen and I get settled into our new home, will have all Finance Committee members who meet their goals and their spouses as guests at private reception at mansion. Want to have cabinet and their spouses present, too, so look forward to a wonderful evening with good friends. Am counting on you, so please don't let me down. I am more grateful to you for this and other help than you will ever know. Kindest regards, sincerely, Guy Hunt, Governor-elect.

On December 21, 1986, Mr. Wilson followed up on Mr. Hunt's mailgram by letter to the potential "Finance Committee" members. In pertinent part, he said:

> Dear Friend, the Inauguration of Guy Hunt as Governor of Alabama on January the 19th 1987, will mark the beginning of a historic new era in our state. I am writing you today to ask for your participation in this important event. There are several ways you can help. First, let me take a moment to tell you why it is so important that you help make the Inaugural activities financially successful. All the expenses of the Inaugural preparation, the cost of the transition to the new administration and the cost of the Inaugural events themselves must be paid for by the Hunt Transition and Inaugural Fund, Inc. The proceeds from the sale of Inaugural tickets, advertising and other contributions, will go into that account and will be used to pay for all of these activities.... I can assure you that the Alabama Inaugural Committee is working very hard to make the Inauguration of Guy Hunt a memorable event for you. We hope you'll enjoy your stay in Montgomery as you participate in this historic occasion. Additionally, the Transition teams are hard at work to construct a government that will keep faith with the people who voted for Governor Hunt in November. We need your help. Please do what you can. It's so important, and all of us who are involved will be grateful to you for your support. If you have any questions about ticket sales or advertising, please contact the Inaugural office. The staff will be glad to help you. Sincerely, Jim.

Enclosed with the letter was a form response letter addressed to Wilson. On that form letter, potential Finance Committee members were asked to indicate in what manner they were willing to participate in the inaugural events and fundraising efforts. Mr. Wilson instructed recipients of the letter that corporate checks for advertising should be made out to HT & IF,[14] and that personal checks should be made out to the 1987 Alabama Inaugural Committee. (R. 34, p. 359)

Evidence was also presented that additional letters were sent to recruit potential Finance Committee members. Ms. Pittman testified that included in these letters was a postscript that stated:

> Corporate checks can be accepted for any advertising and should be made payable to the Hunt Transition and Inaugural Fund, Inc. or Hunt T & I Fund, Inc. Personal checks or PAC checks must be tendered for ticket purchases and should be made payable to the 1987 Alabama Inaugural Committee.

(R. 37, p. 849) A similar postscript was also included in a letter dated January 13, 1987, signed by Ms. Pittman, thanking contributors for contributions. (R. 37, p. 866) In addition, some of the tickets sold for Inaugural events included a disclaimer, "Not for sale to corporations. Part of the proceeds may be

---

**14.** The Hunt Transition and Inaugural Fund.

used for political purposes." (R. 37, p. 861) However, many of the contributors did not actually receive their tickets for inaugural events until the date of the particular event. (R. 37, pp. 914–915)

On December 31, 1986, Articles of Incorporation for the Hunt Transition and Inaugural Fund, Inc. ("HT & IF") were signed by Nancy Elizabeth Porter as the principal incorporator. An accompanying certificate by the probate judge of Cullman County, Tom Burleson, indicated that the HT & IF was to be a non-profit corporation. The Articles of Incorporation along with the certification as a non-profit entity were received and filed in the Office of the Secretary of State on January 2, 1987. Those Articles, in pertinent part, provided that the purpose of the HT & IF was: ·

To provide a nonprofit organization to receive and administer funds provided by contributions, subscriptions and other sources to:

a. Effect an orderly and efficient transfer of the Office of Governor of Alabama to Honorable Guy Hunt, Governor–Elect;

b. Defray a part of the cost of the Inauguration of Governor Hunt;

c. Renovate and improve the building provided by the State as a residence for the Governor and his family and known as the Governor's Mansion;

d. Assist the Governor and his staff to promote the general interest and welfare of the State of Alabama and its People in various other ways, including, without being so limited, through attracting additional business and industry to the State, advertising the State and its resources and supporting other organizations with similar or like purposes;

e. Promote or carry out other scientific, educational, civic, patriotic, political, historical, literary, religious or charitable purposes as may be permitted by law and are not inconsistent with the provisions of these Articles of Incorporation. . . .

(R. 34, pp. 337–338) The Articles further stated:

The name of the initial registered agent . . . shall be Harold F. Miller, Jr. . . . The initial directors of the corporation are Carl Woodard, . . . Edna Earle Hicks, . . . James E. Thompson, . . . John Edward Grenier, . . . and Harold F. Miller, Jr., . . .

(R. 34, pp. 339–340)

On November .26, 1986, an account was opened at the Union Bank and Trust Company at Montgomery, Alabama, under the name of the "1987 Alabama Inaugural Committee," account number 1205175. (R. 34, p. 373; R. 35, p. 478) The only authorized signatories on that account were Edgar Weldon, Judith Pittman and G.R. Swift, Jr. (R. 35, p. 479) Some time in December 1986, the name on the account was changed to the "Hunt Transition and Inaugural Fund, Incorporated." (R. 35, p. 480) From the time it was opened on November 26, 1986, until February 12, 1987, $722,987.29 was deposited into the account. (R. 35, p. 479) The payees on the checks that were deposited into this account during this period were all variations of "Alabama Inaugural Committee," "Hunt Inaugural Committee," "Friends of Guy Hunt Inaugural Committee," "Hunt Transition and Inaugural Fund," and "1987 Alabama Inaugural Committee." (R. 35, p. 482) The majority of these checks contained notations indicating that the contributions were for advertising or other Inaugural events. (R. 35, p. 483) Robert L. Frye, a retired FBI agent and investigator for the Attorney General, testified regarding checks that had been deposited into the account.

Some of 'em have table; some just list contribution; some have advertising; some specify tickets to the ball; such as eight tickets to the ball, two tickets, general seating; one full page ad for color; Pre-Inaugural dinner; super ticket for Inaugural activities; four tickets to Young Alabama Ball; celebration tickets; two dinner tickets, two general seating tickets; Inaugural Ball.

(R. 35, p. 483)

On January 8, 1987, an account named "Friends of Guy Hunt" was opened at the Union Bank and Trust Company in Montgomery, account number 203052–7. (R. 35,

p. 484) The authorized signatories on this account were Rosie Blocher, Mr. Hunt's bookkeeper, and Edna Earle Hicks, his confidential assistant. (R. 35, p. 484; R. 36, p. 613) The petitioner was not an authorized signatory. From the date the account was opened to February 12, 1987, $394,573.10 was deposited into this account. The payee on checks deposited into the account was the 1987 Inaugural Committee and checks were designated for:

Republican Inaugural Committee; Hunt Transition and Inaugural Fund; Alabama Inaugural Committee; Inauguration Committee; 1987 Alabama Inaugural; Guy Hunt Inaugural Committee; Alabama Republican Party; 1987 Alabama Inaugural Committee, and the tickets are made out for such things as—The checks are made out ... [for] such things as contribution; Ball; Inaugural program advertising; Inaugural activities, two tickets to the Inaugural Eve dinner; two for the Inaugural Ball; three tickets for Young Alabamians Ball; two Young Alabamians Inaugural; Governor Hunt Inaugural; two tickets to the Inaugural Ball; donation for Governor Hunt.

(R. 35, pp. 485–486) Some checks deposited into that account, fifteen to twenty totalling approximately $10,000.00, were made payable to Friends of Guy Hunt. Some of those were checks issued on the accounts of persons closely associated with the petitioner. (R. 35, pp. 486–489) Some checks which were deposited into the account had initially been endorsed "1987 Inaugural Committee" with the proper account number, but the endorsement was changed to "Friends of Guy Hunt," account number 203052–7. (R. 35, pp. 494–95)

On February 12, 1987, check numbers 101, 102, and 103, each in the amount of $100,-000.00 and payable to "Friends of Guy Hunt," were written against the "Friends of Guy Hunt" account at Union Bank and Trust Company in Montgomery, account number

203052–7. (R. 35, p. 495) Each was signed by Edna E. Hicks and Rosie Blocher. (R. 35, pp. 396–397)

On February 14, 1987, check number 103 was deposited into an existing checking account at First Federal Savings and Loan in Cullman, Alabama, called "Friends of Guy Hunt, Guy Hunt Reserve," account number 0160075230. (R. 35, pp. 427, 497–98) The only authorized signatories on that account were Mr. Hunt and Edna E. Hicks. (R. 35, p. 432) The account, at the time of the deposit, was overdrawn in the amount of $255.51. (R. 35, p. 498) Between February 16, 1987, and late 1988, Mr. Hunt personally wrote sixty-two checks on that account which totaled $96,159.08. Most, if not all, clearly indicated that they were in payment of obligations which were personal to Mr. Hunt. (See R. 35, pp. 499–517) [15]

On February 16, 1987, check number 102, written on the Friends of Guy Hunt account at Union Bank and Trust Company, was deposited into a newly opened "Friends of Guy Hunt" account at AmSouth Bank in Cullman, Alabama, account number 075–00775002. (R. 35, pp. 406–07, 519–20) The signatories on this new account were Guy Hunt, Edna Earle Hicks and Rosie Blocher. (R. 35, p. 521) On June 18, 1987, the entire $100,000.00 was transferred back into the Hunt Transition and Inaugural Fund, Incorporated Account at the Union Bank and Trust Company in Montgomery. (R. 35, p. 521)

Between February 16, 1987, and June 18, 1987, the Friends of Guy Hunt account at AmSouth Bank in Cullman earned more than $2,000.00 in interest. (R. 35, p. 521) Following the transfer of the $100,000.00 back to the Union Bank and Trust Company account, several checks were written on the remaining interest in the account and signed by Guy Hunt as maker.[16]

---

**15.** Appendix A is a list of all the checks written against the "Friends of Guy Hunt, Guy Hunt Reserve" account including, where shown by the evidence, the date, payee, amount, and purpose. This list is taken from the testimony of Robert L. Frye and has not been compared to the actual

exhibits which, being photocopies of poor quality, are very difficult to decipher.

**16.** Appendix B is a list of checks drawn against this account with available information about them.

Check number 101 for $100,000.00, written on the Friends of Guy Hunt account at Union Bank and Trust Company, was deposited into a new savings account at the Cullman Savings and Loan styled "Friends of Guy Hunt," number 15385–8, which was opened on February 14, 1987. (R. 35, p. 418) The authorized signatories on this new account were Mr. Hunt, Edna Earle Hicks and Rosie Blocher. (R. 35, p. 426) Also on February 14, 1987, a joint account in the name of "Guy Hunt or Mrs. Guy Hunt," number 15386–6, was opened at Cullman Savings and Loan. (R. 35, pp. 419–421) Mr. Hunt was the sole authorized signatory on this account. (R. 35, p. 427) The petitioner personally opened both the "Friends of Guy Hunt" account and the "Guy Hunt or Mrs. Guy Hunt" accounts. On November 12, 1988, Mr. Hunt changed the signature cards on both the accounts by signing one signature card, which then represented both accounts. (R. 35, pp. 422–429) This new signature card listed "Guy Hunt or Mrs. Guy Hunt" as the only remaining signatories; however, Mr. Hunt was the only person who actually signed the new card. (R. 35, pp. 422–429) Mr. Patrick Clark, President of Cullman Savings and Loan, testified that once the signature card was changed on the "Friends of Guy Hunt" account, Guy Hunt, individually, became the new owner of the former "Friends of Guy Hunt" account. (R. 35, p. 425) Interest on the account for 1988 was paid to "Guy Hunt or Mrs. Guy Hunt" and that interest was reported by Cullman Savings and Loan to the Internal Revenue Service and the Alabama Department of Revenue as income to Mr. Hunt and his wife. (R. 34, p. 424)

Between October 16, 1987, and December 29, 1989, Mr. Hunt made ten withdrawals from either the Cullman Savings and Loan "Friends of Guy Hunt" or the combined "Friends of Guy Hunt" and "Guy Hunt or Mrs. Guy Hunt," account in the form of cashiers checks which totaled $108,380.00. All the cashier's checks were used to cover expenses which were personal to Mr. Hunt.[17]

### IV. The Claims.

### A. Selective Prosecution.

The petitioner contends first that the decision to prosecute him was "arbitrary, capricious, selective and discriminatory" in violation of the Equal Protection[18] and Due Process Clauses[19] of the Fourteenth Amendment.[20] In support of this claim, the petitioner argued and proffered evidence that other Alabama public officials had used excess campaign funds for personal use, but that they had not been prosecuted.[21] The

---

17. Appendix C is a list of all the withdrawals from the "Friends of Guy Hunt" savings account at Cullman Savings and Loan in Cullman, Alabama, together with the record evidence about them.

18. The selective prosecution of a defendant violates the Equal Protection Clause of the Fourteenth Amendment. *Wayte v. U.S.*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985); *see Yick Wo v. Hopkins*, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1072–1073, 30 L.Ed. 220 (1886) (It was a violation of the Equal Protection Clause when Chinese laundry owners were prosecuted and non-Chinese laundry owners who committed similar offenses were not prosecuted.)

19. A vindictive prosecution violates the Due Process Clause. *Blackledge v. Perry*, 417 U.S. 21, 28–29, 94 S.Ct. 2098, 2102–2103, 40 L.Ed.2d 628 (1974) (It is a violation of due process when a prosecutor, following the defendant's successful appeal, brings a more serious charge solely to punish the defendant for having exercised the right to appeal.) Though the petitioner alleges that Attorney General Jimmy Evans "vindictively" prosecuted him, the circumstances here more nearly fit the "selective prosecution" model. The

court is satisfied that Mr. Hunt cannot establish a claim for vindictive prosecution.

20. The petitioner moved unsuccessfully to dismiss the indictment on selective prosecution grounds, (R. 3, p. 441; R. 32, p. 1091), and included the ground in his motion for judgment of acquittal, (R. 36, p. 798; R. 37, p. 816; R. 38, p. 1163; R. 20, p. 3995), and in his post-trial motion for judgment of acquittal or in the alternative for new trial, (R. 21, p. 4086; R. 26, p. 4999). The claim was argued to both the Alabama Court of Criminal Appeals and the Alabama Supreme Court.

21. At the trial level, the petitioner offered Defendant's Exhibits 118 and 119, consisting of an analytical summary of the Ethics Statements filed by each Alabama State Senator and Representative purportedly demonstrating that not one of the 140 elected officials had reported the personal use of excess campaign funds for the years 1991 and 1992; Defendant's Exhibit 54, consisting of the Summary of Contributions and Expenditures, filed pursuant to the Fair Campaign Practices Act, of a member of the Alabama House of Representatives that listed $5,400.00 of

petitioner also presented some evidence in this court which suggested an improper prosecutorial motive on the part of the Attorney General, Jimmy Evans.[22]

■ The criminal justice system accords prosecutors broad discretion in determining whom to prosecute. *Wayte v. United States,* 470 U.S. 598, 607, 105 S.Ct. 1524, 1530, 84 L.Ed.2d 547 (1985). The courts indulge a rebuttable presumption that criminal prosecutions are undertaken in good faith and not for any discriminatory or improper reason. *Johnson v. Wainwright,* 778 F.2d 623, 630 (11th Cir.1985), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987) (A prosecutor's exercise of discretion carries great weight because of the public belief that the prosecutor acts with expertise and in the interest of justice). Furthermore, this discretion is "particularly ill-suited to judicial review." *Wayte,* 470 U.S. at 607, 105 S.Ct. at 1530. Nonetheless, such discretion is not unfettered; "[s]electivity in the enforcement of criminal laws is ... subject to constitutional constraints." *Id.* at 608, 105 S.Ct. at 1531, *citing United States v. Batchelder,* 442 U.S. 114, 125, 99 S.Ct. 2198, 2205, 60 L.Ed.2d 755 (1979). Specifically, the decision to prosecute may not be " 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' " *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531, *quoting Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668–669, 54 L.Ed.2d 604 (1978), *quoting Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), "including the exercise of protected statutory and constitutional rights." *Wayte,* 470 U.S. at 608, 105 S.Ct. at 1531, *citing United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982). A prosecutor may not select an individual for

prosecution solely because of the exercise of rights under the First Amendment. *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707 n. 4, 106 S.Ct. 3172, 3178 n. 4, 92 L.Ed.2d 568 (1986).

■ However, to show selective prosecution, the petitioner must overcome a "heavy burden" by establishing two requirements. First, the petitioner must establish that he has been singled out for prosecution when others, similarly situated, have committed the same acts and have not been prosecuted. *Jones v. White,* 992 F.2d 1548, 1571 (11th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 448, 126 L.Ed.2d 381 (1993), *and cert. denied,* —— U.S. ——, 114 S.Ct. 727, 126 L.Ed.2d 691 (1994); *Owen v. Wainwright,* 806 F.2d 1519, 1523 (11th Cir.1986) (per curiam), *cert. denied,* 481 U.S. 1071, 107 S.Ct. 2466, 95 L.Ed.2d 875 (1987). Second, the petitioner must demonstrate that he was invidiously selected for prosecution. *Jones,* 992 F.2d at 1571; *Owen,* 806 F.2d at 1523. Here, the petitioner must establish that the Attorney General was prompted by "constitutionally impermissible motives such as racial or religious discrimination or [the petitioner's] exercise of constitutional rights." *Owen,* 806 F.2d at 1523.

The evidence proffered to the trial court is sufficient to meet the first prong of the prima facie case only if the monies which were the subject of the indictment were in fact "campaign funds." There is substantial evidence in the record to support a finding that the monies were campaign funds. Judy Pittman, Executive Director of the Inaugural Committee, testified that the funds were raised "to pay for the transition and the Inauguration and to raise campaign dollars." (R. 37, p. 825) In addition, James W. Wilson, Jr.,

---

contributions expended for "Miscellaneous Personal Expenses" during 1991; Defendant's Exhibits 53 and 55, consisting of the same Representative's Summary of Contributions and Expenditures for 1990 and 1992, respectively.

22. Specifically, the petitioner filed the deposition of chief deputy sheriff Pruett which was referenced earlier. See footnote 11, supra. The statements attributed to Mr. Evans, if true, would lend support to Mr. Hunt's claim that the Attorney General chose to prosecute him for an improper motive. In fairness, it should be noted

that the respondents have filed affidavits of others who also claim to have been present and who vigorously dispute the accuracy of deputy Pruett's testimony. In any event, as noted, no evidentiary hearing is required on this issue; the petitioner has failed to establish the first prong of a selective prosecution claim; the court is not required to determine whether Mr. Evans acted from an improper motive; and the court takes no position with regard to whether the statements attributed to Mr. Evans were made by him.

Chairman of the Alabama Inaugural Committee in 1987, testified that he understood "that if there were any funds left over after we had paid all the Inaugural bills, that they would be available for political purposes, whatever that need may be, whether you paid campaign expenses or future campaign expenses." (R. 34, p. 371) Furthermore, letters and tickets to inaugural events, although issued subsequent to receiving contributions, indicated that some of the funds might be used for political purposes.

However, the record is also replete with evidence that the funds were raised for transition and inaugural expenses. Specifically, the mailgram from Mr. Hunt, which initiated the solicitation of the funds, referred only to contributions to underwrite the transition and inauguration. In addition, Mr. Wilson's letter following the mailgram referred only to funds to be raised for the transition and inauguration.

Both Alabama appellate courts found the monies were not "campaign funds," but provided little analysis to support that conclusion. The Alabama Court of Criminal Appeals stated, "we find that the funds in question in this case were solicited on behalf of a non-profit (sic) corporation, after Hunt had been elected, and so were not 'excess campaign funds' " and "this case does not involve excess campaign funds." *Hunt v. Alabama*, 642 So.2d 999, 1006, 1014 (Ala.Crim.App. 1994). The Alabama Supreme Court said, "This argument might have some force if the funds involved were, in fact, campaign funds. However, the facts show that the funds used by Hunt were not campaign funds, but that they were, instead, funds solicited by and contributed to a nonprofit charitable corporation." *Ex parte Hunt*, 642 So.2d 1060, 1064 (Ala.1994).

On federal habeas review, the district court, in the absence of any of the conditions of 28 U.S.C. § 2254(d), must presume that state court findings of historical fact are correct.[23] Thus, the Alabama Supreme Court's finding that the funds at issue were not campaign funds must be presumed correct, provided the threshold conditions of § 2254(d) are met and none of the exceptions of that section are present. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). This presumption of

---

**23.** 28 U.S.C. § 2254(d) provides as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph (8) that the record in State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

correctness does not apply to legal conclusions or to mixed questions of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The difference between factual and legal findings has been described thus,

> Factual issues involve "what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators....' " *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745 [756 n. 6], 9 L.Ed.2d 770 (1963), *quoting, Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397 [446], 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.). On the other hand, mixed questions of law and fact involve "the application of legal principles to the historical facts of [the] case." *Cuyler,* 446 U.S. at 342 [100 S.Ct. at 1715]. As Justice Frankfurter once stated: "Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts ... the [Federal] Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." *Brown,* 344 U.S. at 507 [73 S.Ct. at 446] (opinion of Frankfurter, J.).

*Hance v. Zant,* 696 F.2d 940, 946–47 (11th Cir.), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983).

It is not entirely clear that the question of whether the monies were, or were not, campaign funds is one of fact or whether it is one of law. The trial court apparently considered it a question of fact. The court's jury charge permitted the jury to return a verdict based upon one of at least three theories. First, the jury could have concluded that the funds at issue were campaign funds and that they were lawfully expended.[24] Second, the jury could have concluded that the funds were campaign funds and that they were unlawfully expended.[25] Third, the jury could have concluded that the funds were not campaign funds but funds raised for inaugural and transition expenses, and that they were unlawfully converted to Mr. Hunt's "direct personal financial gain." Thus, at the trial level, the question of whether or not the monies were "campaign funds" was left to the jury.

Both the Court of Criminal Appeals and the Supreme Court of Alabama seemingly treated the issue as either a question of law or a mixed question of fact and law. In either event, this court's treatment of the issue is the same.

If the question is one of fact, the conclusion by the Alabama Supreme Court must

**24.** The jury charge included the following language: "The Court would charge the jury that it is not unlawful to use excess campaign funds to defray any ordinary and necessary expenses incurred by the Defendant in connection with any duties as a holder of office. I would further charge this jury that it is not unlawful to use excess campaign funds to reimburse old or new campaign debts, or the interest on the said debts where the debts were incurred for and are connected to campaign expenses." *Ex parte Hunt,* 642 So.2d at 1065. Mr. Hunt presented considerable evidence that, in using the funds from the "Friends of Guy Hunt, Guy Hunt Reserve" account at First Federal Savings and Loan and the "Friends of Guy Hunt" at Cullman Savings and Loan and the interest paid to the "Friends of Guy Hunt" account at AmSouth Bank in Cullman, he was reimbursing himself for loans to his past campaigns and interest he had paid on those loans. There was also evidence from the State that he had already been reimbursed for those past campaign debts. The court's charge would have permitted the jury, if it believed the petitioner's evidence, to find him not guilty on the theory that the monies were campaign funds and that they were used for an authorized purpose, i.e. to reimburse old campaign debts.

**25.** The jury charge included the following language: "The Court would further charge the jury that the Alabama Ethics Act provides that no public official shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated, unless such use and gain are specifically authorized by law. The use of excess campaign funds for direct personal financial gain is, therefore, not a 'lawful purpose' as that phrase is used in the Fair Campaign Practices Act." *Ex parte Hunt,* 642 So.2d at 1065. Under this instruction and the evidence, the jury would have been authorized to find that the monies raised were campaign funds but that Mr. Hunt had used them for "direct personal financial gain" and not to reimburse himself for past campaign debts.

stand, because the § 2254(d) threshold is met. In the absence of any of the eight § 2254(d) factors, the petitioner may overcome the presumption of correctness only by establishing by clear and convincing evidence that the state court's factual finding was wrong. *Sumner v. Mata*, 449 U.S. at 546, 101 S.Ct. at 768. The evidence admitted during the trial plainly supports, but certainly does not compel, the factual conclusion that the funds at issue were not "campaign funds."

If the question is one of state law or a mixed question of law and fact, this court may not second-guess the conclusions of the Alabama Supreme Court concerning the application of Alabama law to findings of historical fact. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Estelle v. McGuire*, 502 U.S. 62, 63, 112 S.Ct. 475, 477, 116 L.Ed.2d 385 (1991); *see also*, *McBride v. Sharpe*, 25 F.3d 962, 972 (11th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 489, 130 L.Ed.2d 401 (1994). While generally a federal habeas court must review mixed question of fact and law de novo, application of *state law* to findings of historical fact by the state court must be distinguished from the application of federal constitutional principles to findings of historical fact. Errors of the latter kind must be reviewed de novo by the federal habeas court; a determination of the former "would nevertheless remain a question of state law, errors of which are not cognizable in federal habeas proceedings." *Lewis v. Jeffers*, 497 U.S. 764, 783, 110 S.Ct. 3092, 3103, 111 L.Ed.2d 606 (1990). Thus, the Alabama Supreme Court's conclusion that the funds at issue were not "campaign funds" is not reviewable by this court upon a habeas corpus petition.

**26.** At oral argument, counsel for the petitioner conceded that the selective prosecution claim is viable only if the funds at issue were "campaign funds."

**27.** The description of these claims is the petitioner's. Neither the ex post facto clause of Article I, section 9, a prohibition against federal action, nor the similar provision of Article I, section 10, a prohibition against state action, applies to judicial decisions. See *James v. United States*, 366

Since the funds at issue were not campaign funds, the petitioner has failed to establish the first prong of the prima facie case of selective prosecution.[26] Specifically, petitioner has failed to present evidence of any other Alabama public official who was not prosecuted for converting non-campaign funds to personal use.

**B. Judicial Ex Post Facto.[27]**

**1. General Principles.**

The petitioner asserts two aspects of the proceedings resulting in his conviction denied him due process in violation of the Fourteenth Amendment in a manner akin to ex post facto violations. First, Mr. Hunt contends that, by construing the "direct personal financial gain" language of Alabama Code Section 36–25–5 (1975) so that the ethics violation was not complete until he spent the last of the funds from the First Federal Savings and Loan and the Cullman Savings and Loan accounts, the Alabama Supreme Court impermissibly revived the then-expired statute of limitations, as established at Alabama Code Section 15–3–1 (1975). Second, he contends that prior to the trial court's instruction to the jury that it was unlawful to convert excess campaign funds to personal use, it was well established in Alabama law that such use was permissible.

Article I, § 10, of the United States Constitution prohibits the states from passing ex post facto laws. This prohibition applies directly to state legislatures, but the Supreme Court has held that the Due Process Clause protects criminal defendants against action by the judiciary that would contravene the ex post facto clause if done by the legislature. *Marks v. United States*, 430 U.S. 188, 191–92, 97 S.Ct. 990, 992–93, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia*, 378 U.S.

U.S. 213, 247–248, 81 S.Ct. 1052, 1070–1071, 6 L.Ed.2d 246 (1961) (separate opinion of JJ. Harlan and Frankfurter). More properly they should be understood to assert violations of the Due Process Clause of the Fourteenth Amendment. Whether described in terms of due process or the ex post facto clauses, the analysis in each case is the same. Use of the term "judicial ex post facto" provides a useful, though not entirely accurate, label for the matter under consideration.

347, 353–54, 84 S.Ct. 1697, 1702–03, 12 L.Ed.2d 894 (1964).

[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the Constitution forbids.... If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction.

*Bouie,* 378 U.S. at 353–54, 84 S.Ct. at 1702.

**2. The Statute of Limitations.**

Mr. Hunt asserts that the Alabama Supreme Court's construction of the Ethics Act, that funds received by the wrongdoer must be "spent" before he "obtains direct personal financial gain," was an "unexpected and indefensible" change in then existing law which had the effect of reviving the statute of limitations applicable at the time the offense was committed.

**a. Exhaustion of State Remedies and Procedural Default.**

██ Respondents assert that the petitioner procedurally defaulted on this claim because "it was raised for the first time in [his] rehearing brief to the state supreme court" and because it was not adequately brought to the attention of that court on the petition for rehearing. Generally, a state prisoner must exhaust remedies available to him in state court before becoming eligible to have his claims considered by the federal habeas court. 28 U.S.C. § 2254(b), (c); *Picard v. Connor,* 404 U.S. 270, 278, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971) ("We ... hold that the substance of a federal habeas corpus claim must first be presented to the state courts."); *Walker v. Zant,* 693 F.2d 1087 (11th Cir.1982); *Bufalino v. Reno,* 613 F.2d 568 (5th Cir.1980). The requirement is a "codification of a federal jurisdictional policy designed 'to effect a proper balance between the roles of state and federal judicial institutions in protecting federal rights.'" *Ogle v. Estelle,* 592 F.2d 1264, 1267 (5th Cir.1979). As a matter of comity, this policy requires the federal courts to allow the states the initial opportunity to pass upon and correct alleged violations of its prisoners' rights. *Fay v. Noia,* 372 U.S. 391, 437–38, 83 S.Ct. 822, 848–49, 9 L.Ed.2d 837 (1963); *see also Bell v. Wainwright,* 531 F.2d 1339 (5th Cir. 1976). State prisoners must have fairly presented the substance of their claim to the state courts. *See Manning v. Alabama,* 526 F.2d 355 (5th Cir.1976); *Alonzo v. Estelle,* 500 F.2d 672 (5th Cir.1974).

Respondents assert that the petitioner disentitled himself to relief in this court by procedurally defaulting on the "judicial ex post facto" claim in state court. They argue that the issue should have been raised in the trial court, on direct appeal in the court of appeals and on the petition for the writ of certiorari in the Alabama Supreme Court.

██ If a petitioner has procedurally defaulted on a constitutional claim, he is barred from litigating that claim in a federal habeas corpus proceeding unless he can show adequate "cause" for and "actual prejudice" from the default. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Engle v. Issac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The "cause and prejudice" test of *Coleman v. Thompson, Engle v. Issac* and *Wainwright v. Sykes* is in the conjunctive—the petitioner must prove both cause and prejudice. The court is satisfied, first, that there was no procedural default and, second, that if the petitioner defaulted the claim, both the cause and the actual prejudice standards are met here.

██ In *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988), the United States Supreme Court spoke to the standard used to determine whether a habeas petitioner has established "cause" for a procedural default:

In *Wainwright v. Sykes,* 433 U.S. 72 [97 S.Ct. 2497, 53 L.Ed.2d 594] (1977), this Court adopted the "cause and prejudice" requirement of *Francis v. Henderson* [425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976)], for all petitioners seeking federal habeas relief on constitutional claims defaulted in state court. The *Sykes* Court did not elaborate upon this requirement,

but rather left open "for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard." 433 U.S., at 87 [97 S.Ct. at 2507]. Although more recent decisions likewise have not attempted to establish conclusively the contours of the standard, they offer some helpful guidance on the question of cause. In *Reed v. Ross,* 468 U.S. 1 [104 S.Ct. 2901, 82 L.Ed.2d 1] (1984), the Court explained that although a "tactical" or "intentional" decision to forgo a procedural opportunity normally cannot constitute cause, *id.,* at 13–14 [104 S.Ct. at 2909], "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met." *Id.,* at 14 [104 S.Ct. at 2909]. The Court later elaborated upon *Ross* and stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 [106 S.Ct. 2639, 2645, 91 L.Ed.2d 397] (1986). We explained that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, ... would constitute cause under this standard." *Ibid.* (Citations omitted.)

*Amadeo v. Zant,* 486 U.S. at 221–22, 108 S.Ct. at 1776. See also, *McCleskey v. Zant,* 499 U.S. 467, 497–98, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991); *Pitts v. Cook,* 923 F.2d 1568, 1571 (11th Cir.1991). It follows that Mr. Hunt had "cause" for any procedural default if the factual or legal basis for this claim was not reasonably available to him before the Alabama Supreme Court ruled as it did on the "direct personal financial gain" language of the statute. *Amadeo v. Zant, supra.* See also, *Johnson v. Dugger,* 911 F.2d 440, 457 (11th Cir.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 361, 121 L.Ed.2d 274 (1992); *Presnell v. Kemp,* 835 F.2d 1567 (11th Cir.1988), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989); *Adams v. Dugger,* 816 F.2d 1493 (11th Cir.1987), *rev'd on other grounds,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989).

In *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984), the Supreme Court addressed the issue of whether an attorney has a "reasonable basis" upon which to develop a legal theory when the "court has articulated a constitutional principle that had not been previously recognized but which is held to have retroactive application." 468 U.S. at 17, 104 S.Ct. at 2911. The court indicated that in situations where one of its decisions explicitly overruled one of its precedents, "there will almost certainly have been no reasonable basis upon which an attorney previously could have urged a state court to adopt the position that this Court has ultimately adopted." *Id.* A new retroactive case which constitutes a "clear break with the past" will provide the "cause" to excuse a procedural default.

This issue was not available to the petitioner in the trial court because that court, without elaborating or stating a factual or reasonably specific legal basis for its decision, simply declined to dismiss Count One of the indictment. The court did not instruct the jury on any issue related to the statute of limitations issue. Thus, the question of whether there would ultimately be a decision that arguably contravened the Due Process Clause because it was an unexpected and indefensible expansion of prior law was not available at the trial court level and could not have been raised in that court or the Court of Criminal Appeals.

The Court of Criminal Appeals explained its decision by reference to Alabama Code section 13A–8–1(6), which defines "obtain" as, "In relation to property, to bring about a transfer or purported transfer of a legally recognized interest in the property, whether to the obtainer or another." *Hunt v. Alabama,* 642 So.2d at 1018. It then went on to hold:

We find without merit and contrary to the evidence Hunt's, contention that, if at all, he received direct personal financial gain on November 12, 1988, because the Friends of Guy Hunt account was closed and simultaneously a personal account was opened. The witnesses' testimony and the records themselves clearly show that the account was not closed or merged on No-

vember 12, 1988, as Hunt contends, but that it remained in existence well after December 29, 1989, the date of the withdrawal of $11,700. The record refutes any contention that, by the bank's notations of November 12, there was any transfer of a legally recognized interest in the account to Hunt. No transfer occurred because the interest held by Hunt after November 12 was the same interest he held before November 12. By the clear language and intent of the statute, we find that the elimination of Hicks and Blocher as signatories on the Friends of Guy Hunt account on November 12 did not transfer to Hunt a *direct* and *personal* financial gain.[28]

*Id.* at 1020. The Alabama Supreme Court seems to have tried to distance itself from the holding by the court of appeals that Mr. Hunt's interest in the funds was the same after November 12, 1988, that it had been before that date.

> Hunt argues that the last possible date that he obtained any gain was November 12, 1988; he says that on that date the Cullman Friends account, into which check number 101 from the Friends account at Union Bank and Trust was deposited, was closed and merged into his personal account.
>
> \*　\*　\*　\*　\*　\*
>
> ... The crime was not complete when Hunt became the sole signatory on the account containing funds raised for his inauguration....
>
> \*　\*　\*　\*　\*　\*
>
> ... [W]e conclude, that, upon Hunt's gaining exclusive control over the Cullman Friends account, the crime defined in terms of the receipt of a "direct personal financial gain" was incomplete.

*Ex parte Hunt,* 642 So.2d at 1067. For the first time in the case, the supreme court held that it was the transfer of the last of the funds from the Cullman Friends account to Mr. Hunt's personal account and its use to cover a mortgage payment on his farm that completed the offense proscribed by the Ethics Act. Clearly, then, the petitioner had no factual or legal basis to raise the "judicial ex post facto" claim until the Alabama Supreme Court issued its opinion.

In his brief in support of the application for rehearing, Mr. Hunt, after arguing the effect of the court's statute-of-limitations ruling, stated, "To the extent that the Court is now announcing the law of this State to be that a violation of 36–25–5 can only occur when a public official spends his gain, such a statement constitutes a judicial ex post facto law and is prohibited by both state and federal constitutions *as discussed previously.*" *Brief and Argument of Petitioner in Support of Application for Rehearing,* at 16 (emphasis added). Mr. Hunt had previously discussed the concepts set out in *Bouie* and *Marks* in the context of the trial court's jury charge. Clearly, then, this language was sufficient to call to the attention of the Alabama Supreme Court his contention that similar principles applied to both the jury charge and its own decision interpreting the "direct personal financial gain" language. *Cf., Magill v. Dugger,* 824 F.2d 879, 891 (11th Cir.1987); *Cooper v. Wainwright,* 807 F.2d 881, 886–88 (11th Cir.1987).

■ The prejudice resulting from the application of the Alabama Supreme Court decision to the petitioner's case is apparent. There could have been no conviction in the absence of the court's ruling as it did.

■ On the issue of procedural default, the court concludes there was none because the petitioner raised the due process issue in the context of the statute of limitations at the first opportunity. Alternatively, if this be viewed as a procedural default, the petitioner

---

**28.** The holding that Mr. Hunt's legal interest in the "Friends of Guy Hunt" account was the same before and after November 12, 1988, strikes the court as dubious at best. The court relied only upon the bookkeeping records at Cullman Savings and Loan and simply ignored the evidence that the savings institution treated Mr. Hunt as the "owner" of that account when he became its sole signatory. The conclusion that Cullman Savings and Loan treated Mr. Hunt as the owner of the account is strongly supported by the evidence that it paid interest on the account for 1988 to him and reported that interest to the Internal Revenue Service and the Alabama Department of Revenue as income to the petitioner.

has shown both cause and prejudice for the failure to timely raise the claim.

■ Furthermore, the court concludes there is no effective state remedy that the petitioner may pursue. Basic to the exhaustion doctrine is the requirement that there be a "state remedy" to exhaust. The petitioner, in the name of exhaustion of state remedies, cannot be required to follow a futile course, one that will leave him in exactly the same position he was in before being sent back to state court. *Nix v. Whiteside*, 475 U.S. 157, 163 n. 3, 106 S.Ct. 988, 992 n. 3, 89 L.Ed.2d 123 (1986); *Duckworth v. Serrano*, 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981).

■ Alabama has provided a post-conviction remedy which is available to persons convicted in its courts of criminal offenses. Rule 32.1, *et seq. Ala.R.Crim.P.* It is difficult to see, however, how the remedy could conceivably benefit the petitioner or advance considerations of comity as between the state and federal courts. Here, the decision about which the petitioner complains was made by the Alabama Supreme Court, the highest court in the state. A Rule 32 petition would be filed in the court in which the petitioner was convicted, the Circuit Court of Montgomery County, Alabama. Rule 32.4, *Ala.R.Crim.P.* Decisions of the Alabama Supreme Court are binding on the trial court. An appeal would lie to the Alabama Court of Criminal Appeals, and that court is also bound to follow the decisions of the Supreme Court. Review of a new adverse decision from the Court of Criminal Appeals would then be by petition for a writ of certiorari, a discretionary appeal. Rule 39(a), *Ala.R.App.P.* The petitioner would be left in exactly the same position in which he found himself when he filed his unsuccessful application for rehearing, also a discretionary appeal.

The petitioner is entitled to be heard in this court on his "judicial ex post facto" claim as it related to the applicable statute of limitations.

### b. The State Decision.

■ A violation of the Ethics Act is a felony offense subject to the general three-year statutory period of limitations applicable to felonies in general. Ala.Code § 36–25–27(a) (1975); *Britain v. State*, 518 So.2d 198, 201 (Ala.Crim.App.1987). The limitations period runs from the time the crime is committed, which is when all its essential elements are present and complete. *Pendergast v. United States*, 317 U.S. 412, 63 S.Ct. 268, 87 L.Ed. 368 (1943); *Griffin v. State*, 352 So.2d 847, 850 (Ala.1977). Thus, a violation of Section 32–25–5 occurs at the moment an Alabama public official knowingly or willfully "obtains direct personal financial gain" from the use of his office. The indictment in this case was returned on December 28, 1992. Accordingly, the conviction must rest on conduct which "completed" a violation of the Ethics Act and which occurred after December 28, 1989.

■ Constitutional ramifications of a post-conduct change in the statute of limitations must be distinguished in terms of whether the change merely extended an unexpired limitations period or whether the change revived a period which had already expired at the time of the change. The cases have consistently held that the application of an extended statute of limitations to offenses occurring prior to the extension, where the prior and shorter statute of limitations has not yet run, does not violate the ex post facto clauses. *See United States v. Powers*, 307 U.S. 214, 217–18, 59 S.Ct. 805, 807–08, 83 L.Ed. 1245 *reh'g denied*, 308 U.S. 631, 60 S.Ct. 66, 84 L.Ed. 526 (1939); *United States v. Taliaferro*, 979 F.2d 1399, 1402–03 (10th Cir.1992); *United States v. Madia*, 955 F.2d 538, 539–40 (8th Cir.1992); *Holland v. District Court*, 831 F.2d 940, 942–43 (10th Cir. 1987), *cert. denied*, 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 482 (1988); *United States ex rel Massarella v. Elrod*, 682 F.2d 688, 689 (7th Cir.1982), *cert. denied*, 460 U.S. 1037, 103 S.Ct. 1426, 1427, 75 L.Ed.2d 787 (1983); *United States v. Richardson*, 512 F.2d 105, 106 (3rd Cir.1975); *Clements v. United States*, 266 F.2d 397, 399 (9th Cir.), *cert. denied*, 359 U.S. 985, 79 S.Ct. 943, 3 L.Ed.2d 934 (1959); *Falter v. United States*, 23 F.2d 420, 425–26 (2d Cir.), *cert. denied*, 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1928). When the prior and shorter statute of limitations has not expired, a change that merely

extends the period is seen as procedural and thus does not implicate ex post facto concerns. The Supreme Court has said that "no ex post facto violation occurs if the change effected is merely procedural, and does 'not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.'" *Weaver v. Graham*, 450 U.S. 24, 29 n. 12, 101 S.Ct. 960, 965 n. 12, 67 L.Ed.2d 17 (1981), *quoting Hopt v. Utah*, 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884).

▆▆ Under Alabama law, however, the statute of limitations in a criminal prosecution is a substantive, not a procedural, right. *Stoner v. Alabama*, 418 So.2d 171, 178 (Ala.Crim.App.), *cert. denied*, 418 So.2d 184 (Ala.1982), *and cert. denied*, 459 U.S. 1128, 103 S.Ct. 764, 74 L.Ed.2d 978 (1983); *Alabama v. Whirley*, 530 So.2d 861, 865 (Ala. Crim.App.1987), *rev'd on other grounds*, 530 So.2d 865 (Ala.1988); *Kirby v. Alabama*, 500 So.2d 79, 80 (Ala.Crim.App.1986); *Hall v. Alabama*, 497 So.2d 1145, 1148 (Ala.Crim. App.1986). Thus, once the original statute of limitations has expired, the defendant acquires a vested right to rely on the protective force of the state law that grants him a permanent reprieve from prosecution. "To hold otherwise might be to create a situation which is clearly unconstitutional. This could allow the Legislature [or Judiciary] to enlarge the statute of limitations until the criminal in question was tried and sentenced; clearly an application which is ex post facto." *Stoner*, 418 So.2d at 179 *quoting Manucy v. Wadsworth*, 293 So.2d 345 (Fla.1974); *see also Alabama v. Whirley*, 530 So.2d at 865 ("Where a statute extends the period of limitation, the extension applies to offenses not barred at the time of the passage of the act, so that a prosecution may be commenced at any time within the newly established period. Such a statute, however, cannot operate to revive offenses that were barred at the time of its enactment, since that would make the statute ex post facto." [citation omitted] ); *Tyson v. Johns–Manville Sales Corp.*, 399 So.2d 263, 268 (Ala.1981) (The legislature "has the power to retroactively alter, extend, or curtail an existing limitations period. However, this power 'can only be exercised so as to apply ... where the bar was not

complete before the enactment of the statute'...." *quoting Floyd v. Wilson*, 171 Ala. 139, 141, 54 So. 528 (1911)). In *Falter v. United States*, Judge Learned Hand, speaking for the Second Circuit, astutely articulated the rationale for such a rule:

> Certainly it is one thing to revive a prosecution already dead, and another to give it a longer lease of life. The question turns upon how much violence is done to our instinctive feelings of justice and fair play. For the state to assure a man that he has become safe from its pursuit, and thereafter to withdraw its assurance, seems to most of us unfair and dishonest. But, while the chase is on, it does not shock us to have it extended beyond the time first set, or, if it does, the stake forgives it.

23 F.2d 420, 425–26 (2d Cir.), *cert. denied*, 277 U.S. 590, 48 S.Ct. 528, 72 L.Ed. 1003 (1928). Therefore, a retrospective judicial determination that effectively changes the statute of limitation and revives a previously barred criminal prosecution is in the nature of an ex post facto law and thus violates the defendant's right to substantive due process. The question remains: by what standard does the court determine that a judicial decision, applied retrospectively, has violated the Due Process Clause of the Fourteenth Amendment? The United States Supreme Court first articulated the applicable standard in *Bouie v. City of Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). "If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect." *Bouie*, 378 U.S. at 354, 84 S.Ct. at 1703 (citation omitted). To make this foreseeability determination, the court evaluated (1) the state court's prior interpretation of the statute, and (2) the plain language of the statute itself. *See id.* at 355–56, 84 S.Ct. at 1703–04.

▆▆ Whether the decision of the Alabama Supreme Court was an "unexpected and indefensible" holding that had the effect of expanding the applicable period of limitations is analyzed by reference to prior Alabama law on the subject and the terms of the

statute itself. *Bouie*, 378 U.S. at 354, 84 S.Ct. at 1703. Thus, the court will look to decisions of the Alabama courts which have applied the "direct personal financial gain" language to conduct which was claimed to have violated the Ethics Act.

In *Allen v. Alabama*, 380 So.2d 313 (Ala. Crim.App.1979), *cert. denied*, 380 So.2d 341 (Ala.), *and cert. denied*, 449 U.S. 842, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), Alabama State Treasurer Melba Till Allen was prosecuted and convicted of violating section 32–25–6, using her office to obtain "direct personal financial gain." In *Allen*, the Alabama Court of Criminal Appeals found the evidence sufficient to establish that Allen held an unspecified interest in Leisure and Development Properties, Inc. (Leisure, Inc.), a corporation organized by Allen and others for the purpose of consolidating certain loans by obtaining letters of credit from various banks. *Allen*, 380 So.2d at 331. In addition, the evidence established that Allen had an unspecified interest in several other corporations, including SAND, Inc., which were attempting to purchase and develop property to support a theme park in Alabama. *Id.* Allen and a co-organizer of Leisure, Inc. solicited a $100,000.00 letter of credit by signing a personal promissory note and promising to deposit State funds at the issuing bank. *Id.* The court concluded that this solicitation was on behalf of SAND, Inc. After this solicitation was unsuccessful, Allen and the same co-organizer solicited a $50,-000.00 letter of credit from the American Bank of Geneva, Alabama. *Id.* at 331–32. Allen co-signed a promissory note in the same amount on behalf of Leisure, Inc., issued a written personal guarantee to pay any letter of credit issued to Leisure, Inc., and deposited $725,000.00 of State funds into American Bank of Geneva. *Id.* at 332. The letter of credit was issued but was rescinded within a few days. *Id.* No evidence was presented that Allen ever drew on the credit prior to the rescission or otherwise received

any direct financial gain which was personal to her.[29]

Ms. Allen argued that the evidence was insufficient to establish that she had used her official position or office to obtain direct personal gain as proscribed by the Ethics Act. *Id.* at 330. The Court, after commenting on the evidence that suggested Allen had some interest in the various corporations, stated:

> [B]ased on the recited facts, it is our judgment that *a jury could see through the corporate machinations and draw the inference that Mrs. Allen's association was for the sole purpose of promoting her corporate endeavors, all of which would ultimately redound to a personal gain* on her part.

*Id.* at 332 (emphasis in original).

With respect to the question of when Ms. Allen "obtain[ed] direct personal financial gain" within the meaning of the Ethics Act, two reasonable interpretations of *Allen* are possible. First, the court may have concluded that Ms. Allen's mere solicitations were sufficient, whether successful or otherwise. This interpretation is clearly supported by the court's conclusion that the jury could have found that Ms. Allen's actions *"would ultimately redound to a personal gain."* *Id.* (emphasis in original). Second, the court may have concluded that Allen, by virtue of her association with Leisure, Inc., obtained "direct personal financial gain" when the bank issued a letter of credit to Leisure, Inc. If so, the Ethics Act was violated, i.e., Allen obtained "direct personal financial gain," at the moment she constructively received the credit extension. There was no evidence that either Allen or any corporation with which she was associated drew on the available credit and none that Ms. Allen actually used any of the funds represented by the letter of credit for any expense personal to her."[30] Clearly, the court treated constructive receipt of the credit as a "direct personal financial gain."

---

**29.** Likewise, there was no evidence that either of the two corporations drew any funds from either letter of credit.

**30.** The Alabama Supreme Court did not acknowledge the *Allen* case in its opinion. The Alabama Court of Criminal Appeals cited *Allen,* but not for its interpretation of the "direct personal financial gain" language.

In *Chandler v. Alabama*, 615 So.2d 100 (Ala.Crim.App.1992), *cert. denied*, 615 So.2d 111 (Ala.1993) the mayor of the City of Vernon, Alabama, was convicted of violating the Ethics Law by using his office to negotiate and sell real property which he individually owned. The appellant argued that the State had failed to prove the element of "direct personal financial gain" as required by the Ethics Act. *Chandler*, 615 So.2d at 106. The court stated:

> [I]t is clear from the policy behind this statute, that the term "gain" is not intended to be a precise or comparative term, because it is the appearance of impropriety that this statute seeks to avoid. "A primary objective of the Code of Ethics is that governmental officials avoid recurring situations in which there is a temptation to place personal gain, economic or otherwise, above the discharge of their fiduciary duty to the public. There is nothing new or startling about this concept. The avoidance of the appearance of impropriety is an ethical norm which has governed the conduct of attorneys and judges for decades. Certainly, there is nothing to prevent the Legislature from extending the application of this norm to all branches of the government. Indeed, this is precisely what the Legislature intended...." *Zerweck v. State Commission on Ethics*, 409 So.2d 57, 60–61 (Fla.Dist.Ct.App.1982). *See also Leffingwell v. Lake City*, 257 Iowa 1022, 135 N.W.2d 536, 539 (1965). "The mere fact that a governmental body may be interested in acquiring property in which a public official has a personal interest does not, by itself, invoke sanctions of such statutes. *However, if the interest of the governmental body intensifies to the extent that serious negotiations and discussions regarding the property ensue and the public official has an opportunity to influence the negotiation in any way, the statute is violated. To claim that any*

*violation of the law does not occur until a contract has been entered into would emaciate the statute and vitiate its legislative purpose.* The law would no longer effectively deter a self-dealing official, in the capacity of his position, from engaging in negotiations with other parties for the purpose of purchasing property in which he also had a personal interest. This would permit that official to sell his interest at a time when making of the contract had advanced to a point where it assuredly would be executed." 63A Am.Jur.2d *Public Officers and Employees* § 411.

*Id.* at 106–07 (emphasis added).

Although the express language of the court, reasonably interpreted, strongly suggests that the Ethics Act is violated at a time prior to any actual receipt of funds, the court did not found its decision on that ground. Referring to a check the mayor received for the purchase of his property, the court concluded: "The appellant clearly realized personal financial gain, by *receiving $50,000*, some of which was used to pay off his liens or encumbrances on the property and [the] commission." *Id.* (emphasis added).

The Alabama Supreme Court did cite *Chandler* in its *Hunt* opinion; however, its comments on *Chandler* were limited to dispelling the notion that *Chandler* makes an "appearance of impropriety" criminal under the Ethics Act. *Ex parte Hunt*, 642 So.2d at 1067. The Court then concluded, without further reference to *Chandler*, that the petitioner did not obtain a "direct personal financial gain" until the misappropriated inaugural funds were actually "spent for an improper purpose." *Id.* The Court omitted to mention the holding in *Chandler* that "[t]he appellant clearly realized personal financial gain, by *receiving* $50,000 ..." or the suggestion that Mr. Chandler had violated the Act when the negotiations for the sale of his property to the city became "serious."[31]

---

**31.** In *Britain v. Alabama*, 518 So.2d 198 (Ala. Crim.App.1987), the defendant, an employee of the Alabama State Docks, was convicted upon evidence that, having the authority to order and sign for materials in an unlimited amount, he directed a supplier for his employer to deliver materials to his own home and then caused the employer to pay invoices submitted by the suppli-

er for those materials. The court did not discuss the point at which he "obtain[ed]" a "direct personal financial gain."

In the most recent Alabama appellate case dealing with an Ethics Act violation, *Hill v. Alabama*, 1994 WL 484308, ——— So.2d ——— (Ala. Crim.App. Sept. 9, 1994), the defendant, a police officer, searched a suspect's wallet for identifica-

Common to *Allen* (constructive receipt) and (serious negotiations and receipt of a check) is the expansive view of the meaning of the "direct personal financial gain" language. In *Allen*, the court seems to have approved a conviction based upon receipt of a financial benefit to a corporation with which Ms. Allen had some unspecified connection because the jury could see through the "corporate machinations" and conclude that the letter of credit would "ultimately redound" to the defendant's personal benefit. In *Chandler*, the court seemingly was prepared to affirm on the basis of "serious" negotiations for the sale of the defendant's property to the city of which he was the mayor.

For its *Hunt* opinion, the Supreme Court relied on a civil case in which the *mens rea* requirement of section 36–25–27(a) was entirely absent, giving the statutory language a narrow and even cramped construction which, in theory, could extend the statute of limitations indefinitely.[32] In *Lambert v. Wilcox County Comm'n*, 623 So.2d 727 (Ala. 1993), private citizens brought an action for declaratory and injunctive relief to determine whether a member of the county commission who was also employed as a school bus driver, consistent with his obligations under the Ethics Act, should have voted on a measure to levy a sales tax, the proceeds of which were to be used to refinance a school bond issue. *Lambert*, 623 So.2d at 728. The *Lambert* court concluded that the legislative intent in amending the statute was to strike the balance ... between the policy of eliminating conflicts of interest and the policy of recruiting and retaining those persons best qualified to serve in government." *Id.* Thus, said the court, "direct personal" should

be interpreted narrowly enough so as not to "unnecessarily or unreasonably ... impede the recruitment and retention by the government of those men and women who are best qualified to serve it." *Id.* The Court, quoting from its own advisory opinion interpreting Alabama Constitution Art. IV, § 82 (1901)[33], noted the consequences of a broad interpretation of "personal or private interest."

Under the construction that this language meant any financial interest, every legislator would have a personal interest in many bills. Should a legislator be prohibited from voting on a tax reduction bill because the legislator pays taxes? Should a legislator who is a bank officer be prevented from voting on a bill affecting interest rates? Should a legislator who owns real property be prohibited from voting on ad valorem taxation? These and similar hypotheticals show why Section 82 cannot reasonably be construed to prevent legislators from voting on any bills which will benefit them financially without regard to how many other persons similarly situated will similarly benefit.

*Id.* at 730–31. The court also said:

In keeping with the intent of the legislature in reenacting the Ethics Act in 1975 ... upon Hunt's gaining exclusive control over the Cullman Friends account, the crime defined in terms of the receipt of a "direct personal financial gain" was incomplete. Although Hunt was in control of the funds at that time, he had not received an improper "direct personal financial gain." Only when Hunt, on December 29, 1989, transferred, by check, the $11,700 from the former Cullman Friends account

---

tion during a traffic stop. Moments after the officer left the scene, the suspect realized that two $50.00 bills and nine $20.00 bills were missing from his wallet and he immediately reported the theft. When the officer returned to his station, the missing money was found in his shirt pocket. The Alabama Court of Criminal Appeals affirmed his conviction of violating Section 36–25–5. The court did not discuss the meaning of the "direct personal financial gain" language of the statute and did not take any notice of the Supreme Court's *Hunt* decision.

**32.** The applicable cases, *Bouie* and *Marks*, speak in terms of unexpected decisions that have the

effect of expanding the law beyond what it was before the criminal conduct in question. In one sense, the decision here was to more narrowly, and not more expansively, interpret the Ethics Act. The petitioner argues, however, that the effect was to extend the limitations period by drawing out the criminal conduct to a time within three years of the indictment.

**33.** Alabama Constitution Art. IV, § 82 (1901) provides: "a member of the legislature who has a personal or private interest in any measure or bill proposed or pending before the legislature, shall disclose the fact to the House of which he is a member, and shall not vote thereon."

to his personal account to cover a $16,297 payment on a note secured by a mortgage on his farm, did he receive a direct personal financial gain within the meaning of § 36–25–5.

*Ex parte Hunt,* 642 So.2d at 1067. *Lambert* was a 1993 opinion, issued more than four years after the petitioner became the sole owner of the Cullman Savings and Loan account and more than three years after he removed and spent the last of the funds from that account. *Lambert,* if it represents an "unexpected and indefensible" departure from prior law could not be applied retroactively to the petitioner's case.

The evidence at trial was that on January 3, 1989, Mr. Hunt transferred $17,000.00 from the "Friends of Guy Hunt"/"Guy Hunt or Mrs. Guy Hunt" account,[34] to his personal account at AmSouth Bank and that this deposit covered a check for $16,041.77 to Merchants Bank to renew a mortgage note on a farm owned by Mr. Hunt. This, seemingly, is a payment on the same mortgage obligation made by Mr. Hunt in late December of 1989, which is the basis for his conviction. Similar transfers for other expenses were made on March 24, 1989, and May 10, 1989. The Alabama Supreme Court did not explain why the offense was "complete" when the petitioner had a "direct personal financial

gain" from the transfer and expenditure of the money in December 1989, but did not have a "direct personal financial gain" to "complete" the crime when he made three almost identical transfers and expenditures in January, March and May of 1989.

This court carries no commission to inquire into the Alabama Supreme Court's current interpretation of its previous decisions. *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983); *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990); *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *McCoy v. Newsome,* 953 F.2d 1252, 1264 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992). However, whether such a current interpretation as applied to the petitioner conforms to the requirements of the United States Constitution is a question which the court is duty bound to answer. *Estelle,* 502 U.S. at 67–68, 112 S.Ct. at 480. If the narrow *Hunt* interpretation of the Ethics Act represents a completely "unexpected and indefensible" application of the law and effectively revived a lapsed period of limitations, it cannot be applied retrospectively to this petitioner.[35]

---

**34.** This is the same account from which the transaction of December 28 and 29, 1989, originated.

**35.** Mr. Justice Maddox concluded, on state law grounds, that the prosecution of Mr. Hunt was time-barred. He states that at oral argument he first sought to ascertain from the state's attorneys the "specific acts of misconduct" which formed the basis for the conviction. The reply, in substance, was "that the petitioner solicited funds from contributors to be sent to a nonprofit corporation, that some of the solicited funds were not deposited into the account set up for the receipt of the inaugural funds but were deposited instead into an account at Union Bank and Trust Company styled 'Friends of Guy Hunt,' and that those funds in the Union Bank 'Friends of Guy Hunt' account were later transferred to three separate 'Friends of Guy Hunt' accounts in various other banks." Counsel for the State "variously described [those accounts] as 'bogus' accounts or 'money laundering' accounts." *In re Hunt,* Justice Maddox dissenting, op. at 1509.

In summarizing his view of the statute of limitations issue, Justice Maddox wrote:

It appears ... that both a majority of this Court and the Court of Criminal Appeals have determined, as a matter of law, that the funds involved were not "campaign funds." If that is true, as both Courts have held, and if the wrongful conduct made the subject of the indictment was the diversion of funds that were solicited for a non-profit corporation, then it would appear that the wrongful act occurred, and the offense was complete, when the funds were deposited into the "Friends of Guy Hunt" account at Union Bank and Trust Company. In other words, if as both appellate courts have determined, the funds involved were not campaign funds, then the offense for which the petitioner was convicted occurred at the time he gained such control over the funds that he had received a "direct personal financial gain" as a result, and if the petitioner used the funds that were diverted to what the State's attorney describes as "bogus" or "money laundering" accounts, then an offense occurred and was complete when the petitioner had such control and power over the funds that he had a benefit. As I view it, the question is: when did the petitioner use his office for "direct personal financial gain?"

The difficulty with applying the "unexpected and indefensible" standard to the court's holding lies to a great extent in the nature of the opinion itself. To the extent that the court addresses the issue, it does so more in the form of an "edict" than in the form of a judicial opinion, leaving to the reader the task of filling in the reasoning behind its conclusion that the crime was not "complete" until the last of the funds were transferred to a personal account and spent for an improper purpose. At one point, the court says the crime was "committed" when "inaugural funds were *spent* for an improper purpose." At another, it says the crime was "incomplete" until the money was transferred to a personal account and used to cover a check for his personal mortgage payment.[36] As noted above, the court fails to explain why all the other transfers and expenditures in 1989 did not complete the elements necessary to make a violation of the Ethics Act. The answer, of course, is that they did.[37] The only question is whether each such transfer and expenditure constituted a new and separate use of his office for "direct personal financial gain" or whether they, and the prior expenditures, coalesced to "complete" the use of Mr. Hunt's public office to obtain "direct personal financial gain." If the decision of the Alabama Supreme Court is viewed as holding that all the expenditures formed a single use of public office which was "incomplete" until the last act was done, that would be consistent with existing Alabama law. *See, Ex parte Griffin,* 352 So.2d 847 (Ala. 1977).

Although it was not argued in brief, the Assistant Attorney General seemingly suggested at oral argument that the spending of the last of the funds constituted the final act of a continuing offense. In *Griffin* the court said "if several acts form but one element of an offense, the offense is not complete until the last of such acts has been performed." *Id.* at 850. If the Supreme Court held here, as this court believes it did, that the December 1989 transfer and expenditure was merely the final act of a series of acts that coalesced to constitute the element of obtaining "direct personal financial gain," that decision was neither unexpected nor indefensible.[38]

*Id.* at 1511. He concluded by saying, "I cannot see how a person can have sole possession of a fund and sole control of the disposition of that fund and still not have realized a "direct personal financial gain" in the process, unless the funds were held in some capacity as a trustee agent or custodian." *Id.* at 1513. Justice Maddox would have held that the statutory limitations period "began to run at least as of November 12, 1988, because on that date the petitioner had such 'gain' and 'control' over the funds that the elements of the Ethics Act were then complete." *Id.*

36. The petitioner complains bitterly about the Supreme Court's holding that he had no "direct personal financial gain" until he "spent" the money from the Cullman accounts. Given the evidence in this case, that ruling should not have been completely unexpected. The funds were ostensibly raised for a proper purpose, to pay the expenses associated with the transition and inauguration of Mr. Hunt as governor in 1987. Those funds were placed into separate accounts and, until they were spent, there was still the possibility that they could be used for a lawful purpose. It was not until Mr. Hunt transferred funds from the Cullman accounts and used them to pay for personal expenses that he removed all possibility that the particular funds in question could be used for the inauguration or transition and clearly obtained a "direct personal financial gain" from use of his office.

37. The clear evidence was that Mr. Hunt, beginning on February 16, 1987, and ending on December 28, 1989, personally transferred funds from the three Cullman accounts on seventy-eight separate occasions and spent approximately $206,000, most on items which were clearly personal. Under the Supreme Court decision, on each and every one of those occasions, a violation of the Ethics Act was "committed" and "complete" and the conviction of the petitioner would have been justified based on any or all of those events, had the prosecution been timely initiated. There is no question that he could have been prosecuted and convicted under *Allen, Chandler, Britain* or *Hill.* Indeed, given the evidence that Mr. Hunt treated the Cullman accounts as a personal "slush fund," the *only* reasonable inference would have been that the accounts were set up and intentionally used for his "direct personal financial gain." To conclude, based upon the then-existing authoritative interpretations of the Ethics Act, that the petitioner did not obtain a "direct personal financial gain" until he actually removed and spent the *last* of the money from those accounts in December 1989 would be baffling indeed.

38. "If a *judicial construction* of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect." *Bouie,* 378 U.S. at 354, 84 S.Ct. at 1703.

### 3. The Jury Instructions.

Petitioner also asserts that the trial court's instruction to the jury—that it was unlawful to use excess campaign funds for personal use—was erroneous and contrary to then existing law. In pertinent part, the jury instruction stated:

There is the law called the Fair Campaign Practices Act. That law provides that a committee, a political committee, shall maintain a checking account and shall deposit any contributions received by such committee into such account. No expenditure of funds may be made by any such committee except by check drawn on such account or out of a petty cash fund from which it may make expenditures, not in excess of one hundred dollars to any person in connection with a single purchase or transaction. The Fair Campaign Practices Act became effective July the 1st, 1988. This Act says the following in regard to the use of excess campaign contributions. Amounts received by a principal campaign committee as contributions that are in excess of any amount necessary to defray expenses of the candidate represented by such committee, may be used by such candidate to defray any ordinary and necessary expenses incurred by him or her in connection with his or her duties as holder of office, may be contributed by him or her to any organization described in the title, may be transferred to another political committee, or may be used for any other lawful purpose. The Court would charge the jury that it is not unlawful to use excess campaign funds to defray any ordinary and necessary expenses incurred by the Defendant in connection with any duties as a holder of office. I would further charge this jury that it is not unlawful to use excess campaign funds to reimburse old or new campaign debts, or the interest on the said debts where the debts were incurred for and are connected to campaign expenses. The Court would further

charge the jury that the Alabama Ethics Act provides that no public official shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated, unless such use and gain are specifically authorized by law. The use of excess campaign funds for direct personal financial gain is, therefore, not a "lawful purpose" as that phrase is used in the Fair Campaign Practices Act.

*Ex parte Hunt,* 642 So.2d at 1065.

Petitioner argues that prior to this instruction, Alabama law permitted a public official to use excess campaign funds for personal use. Under the standards articulated in *Bouie v. City of Columbia,* whether the judicial interpretation of the statute is ex post facto and violates due process depends upon whether the judicial construction is "unexpected and indefensible" with reference to the law which had been expressed prior to the conduct in question as determined through an evaluation of (1) the state court's prior interpretation of the statute, and (2) the plain language of the statute. 378 U.S. at 354–56, 84 S.Ct. at 1703–04.

Although no case law previously existed that specifically addressed whether the use of excess campaign funds for personal use violates the Ethics Act, the petitioner cites and relies upon several Advisory Opinions issued by the Ethics Commission and the Alabama Attorney General.

Advisory Opinion No. 80 issued on January 24, 1980, addressed concerns of certain groups and individuals about the relationship between the Alabama Corrupt Practices Act, the predecessor to the present Fair Campaign Practices Act, and the pre–1975 Ethics Act.[39] The Chairman of the Ethics Commission opined that by reading the two statutes in pari materia as they required, the Ethics Act did not seek to regulate the solicitation

---

Thus, it is what the court held that is reviewed and not what the court might have held. However, in deciphering the holding of the state court, this court is not bound by rigid adherence to that court's loose language and want of precision. What this court has done is attempt to

determine what the court actually held and not what it appears to have held.

**39.** Alabama Acts No. 130 amended the Ethics Act in 1975 by adding the words "direct personal" to qualify "financial gain."

of campaign funds by a candidate for public office. The opinion did not address the issue regarding the expenditure of excess campaign funds by an elected official.

Ethics Commission Advisory Opinion No. 466, dated October 29, 1980, answered the question raised by several citizens of Alabama regarding whether the Governor or his family members may properly use State-owned aircraft for personal business without violating the provisions of the Ethics Act. The Ethics Commission concluded that the Ethics Act did not prohibit the use of State-owned aircraft for personal use by the Governor or his family.

In an Advisory Opinion dated April 16, 1990, Attorney General Don Siegelman construed the phrase "may be used for any other lawful purpose" in the Fair Campaign Practices Act, which referred to the use of excess campaign funds. That opinion provided in pertinent part:

[The Fair Campaign Practices Act] specifically sets forth three ways in which excess funds may be lawfully used by a candidate and acknowledges that there may be other lawful ways in which the funds could be used. At present we are aware of one other way the funds may be used. The excess funds *might* be used as personal income by a candidate but he should consult the Alabama Revenue Department and the Internal Revenue Service. There may be other lawful purposes that we are unaware of; however, they must be reviewed on a case-by-case basis as they are presented.

(Respondent's Exhibit 1, p. A–13) (emphasis added).

Finally, in an Advisory Opinion dated March 20, 1991, Attorney General Jimmy Evans addressed a question raised by Melvin G. Cooper, Executive Director of the State Ethics Commission. Mr. Cooper asked whether an unopposed candidate for state office may use campaign funds as personal income. (Respondent's Exhibit 1, p. A–15)

The Attorney General, citing the previous opinion of April 16, 1990, concluded that under the Fair Campaign Practices Act, excess campaign funds may be lawfully used as personal income by a candidate. (Respondent's Exhibit 1, p. A–16) The opinion did not indicate whether the analyses incorporated any other provisions of Alabama law, including the Ethics Act.[40]

 It should first be noted that neither the opinions of the Attorney General nor the Ethics Commission have the effect of law.

[W]ritten opinions of the Attorney General are not controlling. They are merely advisory and, under the statute [Alabama Code section 36–15–19 (1975) ] such opinions operate only to protect the officer to whom it (sic) is directed from liability because of any official act performed by such officer as directed or advised in such opinion.

*Broadfoot v. Alabama,* 28 Ala.App. 260, 261, 182 So. 411 (1938); *see also Holcombe v. Mobile County,* 26 Ala.App. 151, 155 So. 638, *cert. denied,* 229 Ala. 77, 155 So. 640 (1934); *Kirkland v. Alabama,* 529 So.2d 1036, 1040 (Ala.Crim.App.1988) (holding that an interpretation of a statute by the Ethics Commission is not binding on the court, notwithstanding its persuasive authority).

Furthermore, none of the opinions cited by the petitioner stand for the proposition that Alabama law permitted a Governor to use excess campaign funds for personal use during the time period made the subject of the indictment. Although the 1990 and 1991 opinions of the Attorney General suggest that the use of excess campaign funds for personal income by a "candidate" was not then specifically precluded by the Fair Campaign Practices Act, they do not conclude that such use would be authorized by other provisions of Alabama Law, including the Ethics Act. Furthermore, the 1990 and 1991 opinions were issued to officials other than the petitioner and came after the conduct for which the petitioner stands convicted. Thus, as the Alabama Court of Criminal Appeals

---

**40.** In May 1993 the Alabama Legislature amended section 17–22A–7 of the Fair Campaign Practices Act to provide that "Contributions to an office holder shall not be converted to personal use." The amended act excluded from the definition of "personal use" all expenditures for "room, telephones, office expenses and equipment, housing rental, meals, and travel expenses incurred in connection with the duties as a holder of office."

correctly noted, the petitioner "cannot seek refuge in these opinions." *Hunt v. Alabama,* 642 So.2d at 1015.

■ In addition, both the Ethics Act and the Fair Campaign Practices Act require that they be construed "in pari materia" with other related laws.[41] Following this statutory mandate, the trial court's conclusion that the use of excess campaign funds for personal use constitutes the use of office for "direct personal financial gain" in violation of the Ethics Act is neither "unexpected" nor is it "indefensible." This claim is meritless.

## C. Vagueness of the Statute.

The petitioner's third ground is that the statute and indictment under which he was charged were so vague, indefinite and uncertain as to violate the Sixth and Fourteenth Amendments to the Constitution of the United States. The petitioner was charged and convicted of violating the Ethics Act which states in pertinent part:

No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law.

Ala.Code § 36–25–5(a) (1975).

Any person subject to this chapter who knowingly or willfully violates any provisions of this chapter other than the requirements of financial and lobbying disclosure shall be found guilty of a felony and shall be fined not more than $10,000 or less than $2,001, or shall be imprisoned for not more than 10 years but not less than two years or any combination thereof.

Ala.Code § 36–25–27(a)(1) (1975).

■ A state penal statute is unconstitutionally vague when it "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must neces-sarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The vagueness doctrine requires that a statute "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 105, 92 S.Ct. 2294, 2297, 33 L.Ed.2d 222 (1972).

■ However, a statute is not automatically condemned merely because, with each set of given facts, its interpretation is subject to scholarly debate. *See Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952). "The applicable standard ... is not one of wholly consistent academic definition of abstract terms. It is, rather, the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important." *American Communications Association v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950).

■ The petitioner contends that the Ethics Act is unconstitutionally vague because it does not define the term "direct personal financial gain" nor does it set any limitation on what constitutes the use of public office. While specific definitions for these terms might have been desirable, the legislature is not required to write statutes with mathematical precision. Rather, all that is required is that persons of ordinary reason and intelligence be able to determine what is and what is not allowed under the law. "[T]he practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines, Inc.,* 342 U.S. at 340, 72 S.Ct. at 331;

41. The Ethics Act states: "This chapter shall be construed in pari materia with other laws dealing with the subject matter hereof, and repeals all laws and parts of laws in conflict herewith." Ala.Code § 36–25–30 (1975). The Fair Campaign Practices Act states: "It is the intention of the legislature by the passage of this chapter that its provisions be construed in pari materia with other laws regulating political contributions, corporations, or political contributions by corporations." Ala.Code § 17–22A–23 (1975).

**1518**

*see also Colten v. Commonwealth of Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972) ("We believe that citizens who desire to obey the statute will have no difficulty in understanding it.").

In a different context, this issue was presented to another court which found that the Act was not, in the circumstances there presented, unconstitutionally vague. See, *Hunt v. Anderson,* 794 F.Supp. 1557 (M.D.Ala. 1992), *aff'd* 976 F.2d 744 (11th Cir.1992). Likewise, this court finds the Alabama Ethics Act not so vague as to violate the Due Process Clause of the Fourteenth Amendment. The Act prohibits a defined class of persons, Alabama public officials, from utilizing their positions of public trust as a means of obtaining "direct personal financial gain." The evidence was that Mr. Hunt approved and participated in a scheme to use his office as Governor of the State of Alabama to entice citizens and businesses of the state to contribute hundreds of thousands of dollars to a fund to be used for eleemosynary and public purposes and then to convert at least $200,000.00 of those funds to his personal benefit. For him to argue now that he could not reasonably be expected to have known that his conduct would violate the Ethics Act is not creditable. This claim is meritless.

**D. Sufficiency of the Indictment.**

The petitioner asserts that the indictment was so defective that he was deprived of due process when the state courts required him to stand trial on the charge contained in it [42] and that he did not receive sufficient notice of the charges he was called upon to defend. The essence of this claim is that the indictment failed to state a criminal offense against the petitioner because it did not aver that he used his public office to obtain "direct personal financial gain" either "knowingly" or

"willfully." Under Alabama Code section 36–25–27(a) (1975), a public official who uses his public office to obtain a private financial gain is guilty of a felony only if he acts "knowingly or willfully." Noticeably absent from the indictment is any averment that the petitioner acted either "knowingly or willfully" or any reference to the required *mens rea.* [43] The petitioner asserts that the absence of a scienter allegation rendered the indictment fatally defective and that it should have been dismissed. This ground has been completely exhausted in the state courts,[44] and thus properly preserved for habeas review.

▇▇▇ Amendment No. 37 to the Alabama Constitution provides, that "No person shall for any indictable offense be proceeded against criminally by information. . . ." Rule 2.1 of the Alabama Rules of Criminal Procedure provides that "[a]ll criminal proceedings shall be commenced either by indictment or by complaint." See also, *Cisco v. Alabama,* 23 Ala.App. 446, 126 So. 610 (1930) (A felony charge cannot be initiated other than on an indictment.)[45] Under the terms of Amendment 37 and Alabama Code section 15–15–20 (1975), a defendant who insists upon a trial is not permitted to waive the requirement that the prosecution be founded upon a grand jury indictment. *Kennedy v. Alabama,* 39 Ala.App. 676, 690, 107 So.2d 913, 926 (1958) ("[T]he constitutional requisition of indictments generally in all cases of felony is not one conferring a mere personal privilege upon an accused person, but is so imbued with the public concern for due and proper administration of the law that no individual may waive it.")

▇▇▇ Under Alabama law, an indictment that charges the elements of a statutory offense in the language of the statute is

---

**42.** Though couched in terms of "vagueness," the claim is essentially that the indictment failed to state a charge against the petitioner.

**43.** For the text of the indictment, see footnote 5, *supra.*

**44.** The issue was raised unsuccessfully in the petitioner's Motion to Dismiss (R. 3, pp. 441–47), First Supplement to Motion to Dismiss (R. 3, pp. 484–85), Motion for Judgment of Acquittal (R. 20, p. 3995), and Motion for Judgment of Acquit-

tal or in the Alternative Motion for New Trial (R. 21, p. 4086, R. 26, p. 4999). The issue was then raised before the Court of Criminal Appeals and the Alabama Supreme Court. Relief was denied at all levels.

**45.** "An 'indictment' is an accusation in writing presented by the grand jury of the county, charging a person with an indictable offense. . . ." *Ala.Code* § 15–8–1 (1975).

sufficient, provided the statute is sufficiently definite in setting out the constituent elements of the offense. *Ex parte Harper*, 594 So.2d 1181, 1183 (Ala.1991), *cert. denied,* — U.S. ——, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992); *Ex parte Allred*, 393 So.2d 1030 (Ala. 1980).[46] "The crucial question, of course, is whether the indictment sufficiently apprises the accused with reasonable certainty of the nature of the accusation made against him so that he may prepare his defense, that he may be protected against a subsequent prosecution for the same offense." *Ex parte Harper*, 594 So.2d at 1183. There is no doubt that the use of one's public office to obtain "direct personal financial gain" is a criminal offense only if done "knowingly or willingly." Thus, scienter is an essential element of the statutory offense and that essential element is expressly required by the Ethics Act. *See Chandler v. Alabama*, 615 So.2d 100, 107–108 (Ala.Crim.App.1992), *cert. denied*, 615 So.2d 111 (Ala.1993).[47]

In *Davis v. Alabama*, 68 Ala. 58 (1880), the Alabama Supreme Court reversed a conviction based upon an indictment that failed to charge that the underlying offense was committed "knowingly." The Act in question criminalized the conduct of any person who "knowingly ... transport[ed] or move[d], after sunset and before sunrise of the succeeding day, ... any cotton in the seed." *Id.* at 61. In reversing the conviction, the court said:

> We are of opinion, however, that the indictment is defective in another respect. It fails to charge that the defendant "knowingly" committed the act for which he is criminally indicted. The statute is highly penal in its character, and creates a new crime unknown to the common law. Section 5 makes knowledge of the facts essential to the crime, deeming him alone

guilty "who knowingly violates any of the provisions" of the act. The general rule of pleading is, that every indictment ... ought to contain all that is material to constitute the crime, or every necessary ingredient of the offense, stated with precision, or at least certainty and in the customary forms of law. [Citations omitted]. A crime is committed only by a combination of act and intent. "No amount of intent alone is sufficient, neither is any amount of act alone...." [Citation omitted]. In the particular crime here charged, there are forcible reasons for the application of this rule requiring the indictment to state the guilty scienter. The transportation of the prohibited commodity may have been done ignorantly. The defendant may honestly have believed that he was without the prohibited jurisdiction.

*Id.* at 65.

This same principle was re-affirmed in *Associated Industries of Alabama, Inc. v. Alabama*, 314 So.2d 879 (Ala.Crim.App.), *cert. denied*, 294 Ala. 281, 314 So.2d 901 (1975), where the court reversed a conviction under the Corrupt Practices Act on the ground that the indictment failed to allege the essential scienter element. The court stated:

> He whose conduct is defined as criminal is one who "willfully" fails to do any of the acts denounced by the Corrupt Practices Law, and willfulness is an essential and constituent element of the charge in an indictment brought under said law. The indictment failing to so charge renders it fatally defective upon apt demurrer taking the point, as was done in this case, must fall.

*Id.* at 884.

It is clear that under the authority of *Davis* and *Associated Industries*, the indict-

---

46. *Harper* created no new law for Alabama. The courts of this state have long held that when a statute creates a new offense and the language of the statute describes its constituent elements, it is sufficient to indict in the words of the statute unless it does not embrace all the elements of the offense. *Alabama v. Dodd*, 17 Ala.App. 20, 81 So. 356 (1919). See also *Crawford v. Alabama*, 44 Ala. 382 (1870); *Horton v. Alabama*, 53 Ala. 488 (1875); *Holt v. Alabama*, 16 Ala.App. 399, 78 So. 315 (1918).

47. When an indictment is defective in averring an element of the offense, as where it does not on its face charge an offense, or where the accused is left unaware of the nature and cause of the charge against him, the indictment is void and the court is bound to take notice of such a defect even in the absence of an objection. *Edwards v. Alabama*, 379 So.2d 336 (Ala.Crim.App.1979), *cert. denied*, 379 So.2d 339 (Ala.1980).

ment under which the petitioner was convicted was fatally defective. The Alabama Court of Criminal Appeals recognized as much in its opinion here. *See Hunt v. Alabama,* 642 So.2d at 1024. That court, however, relying upon, *Ex parte Harper,* 594 So.2d 1181 (Ala. 1991), concluded that *Davis* and *Associated Industries* had been overruled. *Hunt v. Alabama,* 642 So.2d at 1024. Respectfully, the court suggests that the holding on this issue of the Alabama Court of Criminal Appeals, and the Alabama Supreme Court, is completely at variance with *Harper.*

In *Harper,* the indictment charged that the defendant did "unlawfully sell, furnish, give away, manufacture, deliver, or distribute a controlled substance, to wit: cocaine, in violation of [§] 13A–12–211 of the Code of Alabama." *Id.* at 1182. That statute read, in pertinent part, as follows:

(a) A person commits the crime of unlawful distribution of controlled substances if, except as otherwise authorized, he sells, furnishes, gives away, manufactures, delivers, or distributes a controlled substance enumerated in schedules I through V.

*Id.* The defendant contended that the indictment was void because it did not allege that he had "knowingly" distributed cocaine. *Id.*

Justice Maddox, writing for the court, noted that Temporary Alabama Criminal Rule 15.2 (now Rule 13.2) of the Alabama Rules of Criminal Procedure, required that the indictment "be a plain, concise statement of the facts in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment" and that it state "the official or customary citation of the statute, rule, regulation, or other provision of law which the defendant is alleged to have violated." *Id.* at 1182; *see also* Ala.R.Crim.P. 13.2

The court then reviewed cases from the Alabama Court of Criminal Appeals, noting what it perceived as inconsistencies in the opinions of that court in dealing with allegations of scienter in criminal indictments. Justice Maddox described them as "somewhat confusing, and some are, frankly, inconsistent." *Id.* at 1189. For example, in *Morrison v. Alabama,* 455 So.2d 240 (Ala.Crim. App.1984), the indictment alleged that the trafficking was done "unlawfully," while the statute used the term "knowingly." The court concluded that "[w]hen the indictment charges 'unlawful' possession, then by inference it means 'knowing' possession." *Id.* at 243. In *Stewart v. Alabama,* 580 So.2d 27 (Ala.Crim.App.1990), the court, faced with the same defective indictment situation as in *Morrison,* criticized its own *Morrison* decision.

We decline to adopt th[e] convoluted rationale [that when the indictment charges "unlawful" possession, then by inference it means "knowing" possession.] To do so would be, in essence, to hold that no indictment for any crime need allege a culpable mental state, for the act of being indicted is equivalent to an allegation of a culpable mental state. It suffices to note that such a holding would be contrary to *Davis v. [Alabama]* and *Barbee v. [Alabama,* 417 So.2d 611]. Moreover, we have serious doubt about the finding in *Morrison,* especially when no case law was cited to which we can resort to better understand the rationale behind the holding.... We cannot say that "unlawfully" conveys the statutory definition of "knowingly"....

*Stewart,* 580 So.2d at 30. Finally, in *Whatley v. Alabama,* 586 So.2d 966 (Ala.Crim.App. 1991), the court held that the indictment which followed the language of the statute by charging that the defendant "unlawfully" possessed a controlled substance was not fatally defective for not charging that the defendant "knowingly" acted. The court recognized that the indictment tracked the language of the statute, which did not expressly include the word "knowingly"; thus, the accused was sufficiently informed of the "accusation." *Whatley,* 586 So.2d at 968.

The Alabama Supreme Court in *Harper* concluded that the Court of Criminal Appeals distinguished between indictments that tracked the specific language of the statute by charging an "unlawful" act, and indictments that charged only an "unlawful" act when the underlying statute explicitly prohibited "knowingly" committing such acts.

With respect to the former, the indictment was valid, although "knowledge" would still have to be proved; but, with respect to the latter, the indictment was fatally defective. Accordingly, the *Harper* court held that since the indictment in *Harper* tracked the language of the underlying statute which did not explicitly require that the act be "knowingly" done, the indictment was not defective for failing to allege that the defendant acted with the required *mens rea.* Hence, the court concluded that the appellant "did not have a valid objection in this case." [48] *Harper,* 594 So.2d at 1194.

Additionally, in an apparent effort to resolve any lingering confusion, the *Harper* court went on to state:

> The Court of Criminal Appeals correctly held, in *Stewart,* that if a statute requires that the offense be "knowingly" committed, then the indictment should allege that it was so committed, and if an objection to the indictment is raised by the trial court or the defendant "during the pendency of the proceeding," the indictment is defective and would be subject to dismissal, unless otherwise provided for in Temporary Rule 15.5(c)(2) (now Rule 13.5(c)(2)), which states, in part, that "[n]o charge shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, for any defect or imperfection in the charge which does not tend to prejudice the substantial rights of the defendant upon the merits."

*Harper,* 594 So.2d at 1194. In concluding that *Harper* had overruled *Davis* and *Associated Industries,* the Court of Criminal Appeals failed to recognize that, unlike the statute in *Harper,* the Ethics Act under which the petitioner here was convicted included an express requirement of scienter, i.e. one who "knowingly or willfully" uses his public office for "direct personal financial gain" is guilty of a felony. Ala.Code § 36–25–27(a)(1)

(1975). Under the holding in *Harper,* "if a *statute* requires that the offense be 'knowingly' committed, then the indictment should allege that it was so committed, and if an objection to the indictment is [timely] raised ... the indictment is defective and would be subject to dismissal, unless otherwise provided for in [Rule 13.5(c)(2) of the Alabama Rules of Criminal Procedure]." *Harper,* 594 So.2d at 1194. Inasmuch as the Alabama Constitution requires an indictment in every felony case, it is difficult to understand how the petitioner's "substantial rights" were not violated by an indictment that failed to charge an offense.

■ The Court of Criminal Appeals concluded that the petitioner's "substantial rights upon the merits" were not prejudiced since he sought and received a more definite statement of the charges against him. However, in coming to this conclusion, the court relied upon the rationale applied by the *Harper* court to the *Harper* indictment. In *Harper,* the court stated that the defendant could have filed a motion for a more definite statement, apparently to clear up any confusion surrounding the indictment that merely followed the language of the underlying statute. However, while this procedure was available to the petitioner, the procedure could not be used to cure an otherwise defective indictment. The Committee Comments to Rule 13.2(e), state:

> Section (e) provides a necessary safeguard for the defendant, in that for good cause shown the defendant can compel the state to submit additional details of the offense *not required to be set out in the body of the indictment.*

Ala. R.Crim. P. 13.2(e) (Committee Comments) (emphasis added).[49] The *Harper* indictment, which alleged that the possession was "unlawful," followed the language of a statute that did not expressly require proof that the act be done "knowingly or willfully."

---

**48.** The court also noted that even if the appellant had a valid objection to the indictment, he had failed to timely raise the issue.

**49.** It is "hornbook law" that a bill of particulars cannot suffice to cure an indictment that fails to allege an essential element of the charge. *Russell v. United States,* 369 U.S. 749, 769–770, 82

S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962) (The defendant in a criminal case is entitled to have an adequately informed grand jury return the indictment and not to have an indictment effectively rewritten by the prosecutor. *Id.* at 770, 82 S.Ct. at 1050.)

Thus, additional information regarding the specific *mens rea* alleged could be requested through a more definite statement under Rule 13.2(e), since this additional information is "not required to be set out in the body of the indictment." However, according to *Harper*, when the indictment charges a violation of a statute that expressly requires proof that the act was done "knowingly or willfully," the indictment must aver that the act was done "knowingly or willfully." Otherwise, it is subject to dismissal on motion of the defendant or on the court's own motion.

■■■ Clearly, under Alabama law prior to the appellate court opinions in this case, the indictment should have been dismissed because it failed to allege an essential element of the offense as specifically included in the statutory language of Alabama Code sections 36–25–5 and 36–25–27(a) (1975), the Ethics Act. While the court agrees with the petitioner's assessment of the indictment under which he was convicted, his victory is a hollow one. The sufficiency of a state court indictment is cognizable on federal habeas corpus only if the indictment was so flawed that the state court was deprived of jurisdiction. *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir.1989); *DeBenedictis v. Wainwright*, 674 F.2d 841 (11th Cir.1982); *Murphy v. Beto*, 416 F.2d 98 (5th Cir.1969). In other words, if the state courts had jurisdiction under the indictment to hear the case against the petitioner, this court *does not* have jurisdiction to consider the sufficiency of that indictment under the law applicable to habeas corpus proceedings.

The question of whether the state courts had jurisdiction is one for those courts. "[J]urisdiction to try an offense includes jurisdiction to determine whether the offense is properly charged." *Murphy v. Beto*, 416

F.2d 98, 100 (5th Cir.1969).[50] Therefore, "[w]hen it appears ... that the sufficiency of the indictment was squarely presented to the highest court of the state on appeal, and that court held that the trial court had jurisdiction over the case, the issue is foreclosed to a federal habeas court." *Id.*

The petitioner's challenges to the sufficiency of the indictment were squarely presented and addressed by both the Alabama Court of Criminal Appeals and the Supreme Court. Although the Alabama Supreme Court did not comment, expand, or otherwise explain the discussion on this issue by the Court of Criminal Appeals, the Court sufficiently commented on the issue to foreclose further review by this court when it said:

> The other issues raised by [Mr.] Hunt were properly addressed by the Court of Criminal Appeals. The judgment of that court is affirmed.

*Ex parte Hunt*, 642 So.2d at 1070. *See Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1985) (Where the Texas Court of Criminal Appeals, the highest criminal court in Texas, both refused discretionary review and denied a petition for a state writ of habeas corpus in which sufficiency of indictment claims were presented, without expressly commenting or ruling on the alleged deficiencies, that court necessarily held that the indictment was sufficient for state court jurisdictional purposes.).[51]

■■■ Although this court is not authorized to review the sufficiency of the indictment as a charging instrument, it is bound to consider whether the notice afforded the petitioner through the state procedures was constitutionally sufficient under the Sixth and Fourteenth Amendments. The law is well settled that the federal guarantee of a grand jury indictment has not been applied to the states.

---

**50.** Decisions rendered by the Fifth Circuit Court of Appeals through September 30, 1981, are binding precedent in the Eleventh Circuit unless specifically held otherwise. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981). This court is bound to follow the Fifth Circuit's decision in *Murphy*, for only the Eleventh Circuit or the United States Supreme Court can change it.

**51.** The court in *Alexander* specifically relied on *Murphy v. Beto*. The effect of the *Murphy* line of

cases essentially is to remove from a federal habeas court the power to even consider claims that a state prisoner was convicted on a fatally defective indictment. If the defective indictment issue was not presented to the state's highest court, the federal habeas court is precluded from review on the grounds of procedural default. If the defective indictment was unsuccessfully argued to the state's highest court, the federal habeas court is precluded from disturbing that court's finding that jurisdiction existed.

*Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). However, the Due Process Clause of the Fourteenth amendment does require that whatever charging method the state chooses to employ, it must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense. *Jackson v. Virginia,* 443 U.S. 307, 314, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979); *Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975); *Argersinger v. Hamlin,* 407 U.S. 25, 27–28, 92 S.Ct. 2006, 2007–08, 32 L.Ed.2d 530 (1972); *Cole v. Arkansas,* 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948). The Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

"Because these [Sixth Amendment] rights are basic to our adversary system of criminal justice, they are part of the 'due process of law' that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States." *Faretta v. California,* 422 U.S. at 818, 95 S.Ct. at 2532; *see also In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).

The Eleventh Circuit has not yet addressed the issue of what type of notice is required by the Fourteenth Amendment; however, the Supreme Court cases of *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), and *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), indicate that the constitutional notice requirements mandated in federal criminal cases with respect to grand jury indictments· are not binding on the states that adopt similar grand jury procedures. *But see Alexander v. Louisiana,* 405 U.S. at 636, 92 S.Ct. at 1228 (Douglas, J., concurring, stating that once a state adopts the grand jury as its accusatory body, it must "hew to federal constitutional criteria.").

The Seventh Circuit has suggested that due process requires only that the defendant have notice of what he is charged with in time to adequately prepare his defense, no matter how that notice is conveyed. *Bae v. Peters,* 950 F.2d 469 (7th Cir.1991). The Fifth Circuit appears to have adopted a similar approach in *Liner v. Phelps,* 731 F.2d 1201 (5th Cir.1984), by concluding that due process was not denied when the defendant could obtain additional notice through a bill of particulars. In addition, the United States District Court for the Middle District of Louisiana has stated that "the accused's constitutional right to notice of the charge brought against him can be satisfied by the availability of other means of obtaining notice of the factual or legal basis of the charge against him, such as a bill of particulars, a preliminary examination and criminal pre-trial discovery." *Dowell v. Lensing,* 805 F.Supp. 1335, 1343 (M.D.La.1992), *aff'd,* 996 F.2d 306 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993).

■ In the present case, on a motion for a more definite statement pursuant to Alabama Rules of Criminal Procedure 13.2(e), the petitioner received a "forty or more page response and numerous, voluminous documents further detailing the facts and circumstances of the alleged crime." The petitioner has not demonstrated how the notice provided by this supplementation was constitutionally infirm. Accordingly, the court concludes that the petitioner was given adequate notice of the charges against him in compliance with the due process guarantees of the Fourteenth Amendment.

For the reasons stated here, the claim that the indictment was constitutionally inadequate must be denied.

## E. Remaining Claims.

The remaining claims are without merit but, consistent with its obligation to address and decide all habeas corpus claims, the court will briefly discuss each of them. *Clisby v. Jones,* 960 F.2d 925, 935 (11th Cir.1992) ("[W]e now exercise our supervisory power over the district courts . . . and instruct the district courts to resolve all claims for relief raised in a petition for writ of habeas corpus

... regardless whether habeas relief is granted or denied.").

### 1. Sufficiency of the Evidence.

The petitioner argues that the evidence was insufficient to justify a rational trier of fact in finding him guilty beyond a reasonable doubt. Specifically, the petitioner contends that the evidence was insufficient to establish that the petitioner acted with the required *mens rea*. This claim was exhausted in the state court.[52]

This claim is governed by the holding of the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In *Jackson*, the court said:

> After *[In re] Winship* [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

*Jackson*, 443 U.S. at 318–319, 99 S.Ct. at 2788–2789 (citations omitted) (internal quotes omitted). It is not necessary for the state to eliminate every theory except guilt. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793. Where the inferences from the evidence conflict they are to be resolved in favor of the state, the federal habeas court deferring to the trier of fact. *Id.*

The *Jackson* standard was explained in *Herrera v. Collins*, —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Id.* at ——, 113 S.Ct. at 861 (emphasis in original); *see also, Bishop v. Kelso*, 914 F.2d 1468 (11th Cir.1990); *Mattox v. Dugger*, 839 F.2d 1523, 1524 (11th Cir.) ("While the defendant presented a different version of the facts, it cannot be said that no rational trier of fact could have convicted Mattox. The jury was free to disbelieve the defendant."), *cert. denied*, 488 U.S. 833, 109 S.Ct. 92, 102 L.Ed.2d 68 (1988); *Wilcox v. Ford*, 813 F.2d 1140, 1145 (11th Cir.), *cert. denied*, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987).

■ Without doubt, the evidence was sufficient to meet the Constitutional standard. That evidence has been described in detail and will not be repeated here. See pages 8 through 15. The conclusion that Mr. Hunt acted with the required *mens rea* was sufficiently supported by evidence that he personally sent the "mailgram" to potential finance committee members on December 17, 1986; that he suggested that the committee raise one and one-half million dollars; and that he personally opened bank accounts and personally wrote checks from funds raised for inaugural and transition costs to pay his personal expenses. The evidence was sufficient.

### 2. Claimed Judicial and Juror Misconduct.

#### a. The Judge.

■ The petitioner next avers that the trial judge's misconduct in engaging in ex

---

52. This issue was raised in the Motion for Judgment of Acquittal made at the close of the State's case in chief and in the Motion for Judgment of Acquittal or in the Alternative for New Trial made at the close of all the evidence. The issue was raised before both the Court of Criminal Appeals and the Alabama Supreme Court. Relief was denied at all levels.

parte contacts with third parties and in allowing jurors who had been sequestered to have contacts with third parties without the prior knowledge or consent of the petitioner or his counsel was so fundamentally unfair as to amount to a denial of due process. This ground has been exhausted.[53]

The evidence was that the trial judge had some contact with James Anderson. Mr. Anderson is a lawyer in Montgomery, Alabama; immediate past president of the Montgomery County Democratic Club, "the social and fundraising wing of the Montgomery County Democratic Executive Committee"; former Chairman of the Alabama Ethics Commission; and, at the time of the hearing on the petitioner's motion for new trial, attorney to Governor Folsom for "[e]thics matters that have been filed against" him.

Mr. Anderson testified that several weeks before the trial, he met the trial judge by chance in the hallway of the Montgomery County Courthouse. The judge asked him "where in the law it said that you can or can't use campaign funds for your personal use." Mr. Anderson replied that the Fair Campaign Practices Act provided that campaign funds could be used for "any lawful purpose" and opined that there was no restriction on the spending of those funds for personal use. He stated the trial judge then asked, "[W]hat if someone is soliciting . . . campaign funds for an illegal purpose, [s]uch as, if they solicit campaign funds in violation of the Ethics Act?" Mr. Anderson replied that "the Ethics Law says 'unless otherwise authorized by law' and if the Fair Campaign Practices Act authorized you to do that, then it may make it a legal act." Mr. Anderson testified that the meeting lasted "about three minutes."

There was also evidence that the trial judge sought the counsel of David Shropshire, a member of a men's weekly prayer group to which the trial judge belongs. Mr. Shropshire was the trial judge's "prayer partner." Mr. Shropshire testified that the judge questioned him about whether it would be "gambling" to settle a dispute between the trial counsel about seating arrangements by drawing lots. He testified that the trial judge did not ask his advice on any other matter pertaining to the trial. After the verdict and sentencing, however, Shropshire asked the judge for and received a copy of the court's jury instructions and sentencing order.

It is axiomatic that a defendant in a criminal case is entitled to an impartial tribunal. The record here, however, does not disclose any conduct on the part of the trial judge which would likely lead the jury to a predisposition toward guilt by confusing the functions of judge and prosecutor. *United States v. Robinson,* 687 F.2d 359 (11th Cir.1982); *United States v. Abrams,* 568 F.2d 411 (5th Cir.), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *United States v. Candelaria–Gonzalez,* 547 F.2d 291 (5th Cir.1977); *United States v. Gomez–Rojas,* 507 F.2d 1213 (5th Cir.), *cert. denied,* 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). Nor does the record disclose any direct personal interest by the judge in the outcome of the case.

**b. The Jury.**

The record reflects that the state trial judge ordered that the jury be sequestered during the trial and during deliberations. (R. 34, p. 260) Despite the sequestration order, the court, without informing the parties, allowed jurors to telephone members of their families under the supervision of the court bailiff. (R. 38, p. 1062) Members of the jury were also permitted visits from their own ministers. (R. 38, pp. 1061–1062) The parties stipulated that at least two jurors had received visits from their ministers in their motel rooms. (R. 41, p. 103)

▮ Though not clearly articulated as such, the court construes this to be a claim that the jury, in some way, engaged in misconduct to the petitioner's prejudice. Under the Sixth Amendment, a defendant in a criminal prosecution enjoys the right to a trial before an impartial jury. The concept of an impartial jury includes the principle that the

---

53. This issue was raised during trial by motion and objection (R. 15, p. 2850; R. 38, p. 1065), and by Motion for Judgment of Acquittal or in the Alternative Motion for New Trial. (R. 21, p. 4086; R. 26, p. 4999) The issue was then raised before the Alabama Court of Criminal Appeals and the Alabama Supreme Court. Relief was denied at all levels.

jury will decide the issues in the case solely upon the evidence adduced in open court. Almost one hundred years ago Mr. Justice Holmes wrote:

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence. . . .

*Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). The evidence against a defendant necessarily must come from the witness stand under the supervision of an impartial judge where the defendant's rights of confrontation and cross-examination may be protected. *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965).

▪ Not every introduction of extraneous information into a jury's deliberations requires reversal of a criminal conviction, however. In the Eleventh and the former Fifth Circuit Courts of Appeals, it is the rule that introduction of such extraneous material requires reversal unless there is no reasonable possibility that the extrinsic matter affected the verdict. *Farese v. United States,* 428 F.2d 178 (5th Cir.1970). In *United States v. Staples,* 445 F.2d 863 (5th Cir.1971), *cert. denied sub nom. Kellis v. United States,* 404 U.S. 1048, 92 S.Ct. 710, 30 L.Ed.2d 739 (1972), the trial judge interrogated the jurors and found that only one had examined law books left in the jury room and that the material examined was not relevant to the issues in the case under consideration. The court found no reasonable possibility that the books affected the verdict. In *Paz v. United States,* 462 F.2d 740 (5th Cir.1972), a drug conspiracy trial, the Fifth Circuit Court of Appeals remanded to the trial court with instructions to conduct a hearing to determine "whether there is or is not a reasonable possibility that [certain books dealing with illegal narcotics trafficking] affected the jury's verdict." *Id.* at 746. In *United States v. Howard,* 506 F.2d 865 (5th Cir.1975), a juror made a post-trial affidavit that during the deliberations a juror "stated that the defendant had been in trouble two or three times" though no such evidence had been introduced at trial. The court remanded for a hearing similar to that which was directed in *Paz,* supra. In *United States v. Allison,* 481 F.2d 468 (5th Cir.1973), *cert. denied,* 416 U.S. 982, 94 S.Ct. 2383, 40 L.Ed.2d 759 (1974), the trial court, with the consent of the defendants, permitted an alternate juror to go into the jury deliberation room but with instructions that he was not to participate in the deliberations. On appeal the Fifth Circuit Court of Appeals remanded to the trial court with instructions to conduct a hearing to determine what, if any, participation the alternate had in the deliberations. The Eleventh Circuit has applied the "reasonable possibility" rule in the context of a motion for mistrial after an "anti-marijuana" magazine was found in the jury room. *United States v. Savage,* 701 F.2d 867 (11th Cir.1983). That court applied the same rule to a case where a juror, during deliberations, revealed to his fellow jurors that he had previously known the defendant and had served on a committee with him. *United States v. Perkins,* 748 F.2d 1519 (11th Cir.1984).

▪ Questions of alleged jury misconduct must necessarily be judged on the peculiar facts and circumstances of each case. *United States v. McKinney,* 434 F.2d 831 (5th Cir.1970), *cert. denied,* 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971). The trial court's decision on the issue will be overturned only upon a showing that it abused its discretion. *United States v. Chiantese,* 582 F.2d 974, 978 (5th Cir.1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979). On such questions, the trial court starts with the presumption that the jury is impartial. *United States v. Sedigh,* 658 F.2d 1010 (5th Cir.1981, Unit A), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982). Implicit in all the decisions dealing with jury consideration of extra-judicial evidence is the understanding that before the court is required to determine whether there is a reasonable possibility that the verdict was affected by unlawful material it must determine whether the material actually reached the jurors. If the court decides, on sufficient evidence, that the material was not revealed to the jury there is no occasion for it to decide whether there is a reasonable possibility that the verdict was affected.

After a hearing, the trial court found that no juror had received any improper information about the case from anyone. In the absence of any of the 28 U.S.C. § 2254(d) factors, this court is bound to respect the factual finding that the jurors were still impartial. *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (juror impartiality is a "fact" subject to § 2254(d) presumption.).

The court concludes on this record that the petitioner has failed to establish facts which show even the possibility of juror misconduct and there was no "reasonable possibility" that the verdict was influenced by the jurors' telephone calls to family members or by visits from their ministers.

### 3. Cumulative Prejudice.

The petitioner next argues that an accumulation of many errors worked a fundamental unfairness in violation of the Fourteenth Amendment. This ground has been exhausted.[54]

#### a. Prosecution Misconduct.

Mr. Hunt charges that the "repeated and intentional misconduct of the Attorney General" violated his right to due process under the Fourteenth Amendment to the United States Constitution. He claims that before trial the Attorney General publicly campaigned to "chastise, condemn and ridicule the Governor; introduced personal tax returns and other documents through the news media; and encouraged a grand jury member to speak out openly against [Mr.] Hunt." (R. 27, pp. 183, 186, 187; Exs. 19, 20, 22, 24–31, 34, 36–38, 44–51, 61, 62, 52–60)

Mr. Hunt also alleges that the Attorney General subpoenaed a member of his "defense team," John Grenier, to testify before the Grand Jury; and he required that "some twelve boxes of John Grenier's confidential records be produced."

The petitioner complains that in an effort to influence potential jurors, the Attorney General filed approximately 1,300 pages of documents, including Mr. Hunt's personal income tax returns in open court.

He complains that during his closing statement to the jury, the prosecutor commented on the petitioner's decision to not testify by reminding the jury that there had been no evidence to support the defense position that the questioned funds were used to repay old campaign debts. He complains of other statements made by the prosecution in the closing statement.

#### (1). General Principles.

■■■■ In this circuit, the standard for judging constitutional claims of prosecutorial misconduct in closing argument is set out in *Brooks v. Kemp*, 762 F.2d 1383, 1399–1403 (11th Cir.1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir.) (en banc), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987). In *Brooks*, the court relied on *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974), in which the Supreme Court held that a prosecutor's argument violates the Constitution if it renders the defendant's trial "so fundamentally unfair as to deny him due process." A prosecutor's improper argument that is "so egregious as to create a reasonable probability that the outcome was changed" will require habeas relief. *Brooks*, 762 F.2d at 1403. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). In order to prevail, the defendant must show a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different. *Brooks*, 762 F.2d at 1401–02.[55]

---

54. This issue was raised in petitioner's Motion for Judgment of Acquittal or in the Alternative Motion for New Trial. (R. 21, p. 4086; R. 26, p. 4999) The issue was then raised before the Alabama Court of Criminal Appeals and the Alabama Supreme Court. Relief was denied at all levels.

55. The *Brooks* standard also applies to claims of prosecutorial misconduct at other stages of trial. See *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir.1988) (alleged prosecutorial violation of advocate-witness rule); *Johnson v. Wainwright*, 806 F.2d 1479, 1486 (11th Cir.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987) (alleged misconduct in cross-examination).

The court's task is to determine whether a prosecutor's improper statement, or a series of such statements, had the effect of rendering the entire trial fundamentally unfair. A single remark is analyzed if it is claimed to have violated an expressly enumerated right. See *Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. at 1871; *Brooks,* 762 F.2d at 1400. Different factors have been utilized by various courts in order to decide whether or not the cumulative errors at trial could be said with reasonable probability to have changed the result at trial. These include: (1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *Brooks,* 762 F.2d at 1402; *Walker v. Davis,* 840 F.2d 834, 838 (11th Cir.1988).

The habeas court may not conduct a new trial, but it must weigh the nature and scope of the instances of misconduct against the evidence of guilt against the accused. See, e.g., *Brooks,* 762 F.2d at 1401. Where the evidence of guilt is strong, as here, the misconduct would have to be more egregious. Where the evidence of guilt is weak, less egregious conduct might well merit relief.

### (2). Specific Instances of Alleged Misconduct.

The record does not reflect that the Attorney General's alleged public campaign to influence potential jurors had any effect whatsoever on the jury that was actually seated. This claim is meritless.

Mr. Grenier testified that he was not counsel to the petitioner regarding the matters about which he was called to testify and the trial found, on a sufficient record, that he was not Mr. Hunt's lawyer. That is a finding of fact which this court is bound to respect. Mr. Grenier also testified that he reviewed

the documents which he was called upon to produce to determine that none was subject to the attorney-client privilege. This claim is meritless.

The petitioner has not shown that he was prejudiced by the Attorney General filing his response to the request for a more definite statement in open court.

Mr. Feaga's statement that the defense had not produced evidence to support its claim that there was no personal use of the funds was a fair comment on the evidence and was not a comment on Mr. Hunt's decision not to testify.

Mr. Feaga's comment that, "Every criminal in every penitentiary in this entire county was convicted by a jury ..." (R. 40, pp. 1434–35) was simply wrong; but, in the opinion of the court, it had no effect on the outcome of the trial.

The court has examined the other statements of the prosecutors which are claimed to have been improper and finds that they did not affect the outcome of the trial, particularly in light of the strong evidence of the guilt of the petitioner.[56]

### b. Denial of Public Trial.

The petitioner claims he was denied the right to a public trial guaranteed him under the Sixth Amendment to the United States Constitution. Specifically, he asserts that he objected to any closed door proceedings and insisted that all motions, hearings, testimony and all parts of the trial proceedings be held in open court. (R. 27, pp. 61–63; R. 28, p. 254; R. 32, pp. 1139–1143, 1158) He claims that, over his objections, the trial court conducted certain pretrial proceedings behind closed doors. See generally, *Ex parte Birmingham News Co.,* 624 So.2d 1117 (Ala. Crim.App.1993).

Under the Sixth Amendment, a defendant in a state criminal proceeding is entitled to a public trial.[57] Closure of a trial

---

**56.** There is more than a little suggestion in the record that some of the prosecutors involved in this prosecution view the criminal trial generally and this trial in particular as the modern day equivalent of the Anglo–Saxon "blood-feud."

But as noted in the text, the court is satisfied that their conduct did not go beyond constitutionally permissible bounds so as to require relief here.

**57.** The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy

implicates the defendant's Sixth Amendment right to a public trial as well as the public's First Amendment right to access to the proceedings. *Press–Enterprise Co. v. Superior Court (Press–Enterprise I)*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). On this habeas petition, however, only the petitioner's Sixth Amendment rights are at issue.

The record reflects that the state trial court conducted certain pretrial proceedings *in camera* during March 1993. On a petition for the writ of mandamus, the Alabama Court of Criminal Appeals ordered the trial court to comply with the requirements of *Ex parte Consolidated Publishing Co.*, 601 So.2d 423 (Ala.), *cert. denied*, —— U.S. ——, 113 S.Ct. 665, 121 L.Ed.2d 590 (1992). Concluding that the trial court's response was unsatisfactory, the Court of Criminal Appeals entered an order on March 30, 1993, finding that the trial court, "by the manner in which it ordered the closure of certain pretrial proceedings and the court file ... violated the constitutional provisions of the First Amendment guaranteeing the public and the news media the right of access to criminal proceedings." The lower court was given the option of either (1) immediately affording the news media access to the entire transcripts and court file of the prior closed proceedings or (2) holding a public hearing at which the news media would be allowed to present argument and the trial court would specify the particular portions of the prior proceedings and the court file that were to remain closed or sealed, preparing or including specific and detailed written findings with regard to each portion that the court ordered would remain sealed. On April 9, 1993, the trial court entered an order releasing most of the court records and the transcripts which had previously been sealed, excepting only those dealing with grand jury matters, the attorney-client privilege, or plea negotiations.

In *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the United States Supreme Court considered "the extent to which a hearing on a motion to suppress evidence may be closed to the public over the objection of the defendant consistently with the Sixth and Fourteenth Amendment right to a public trial." *Id.* at 40–41, 104 S.Ct. at 2212. The court in *Waller* found that the "right to access" cases under the First Amendment cases were "relevant precedents." *Id.* at 44, 104 S.Ct. at 2214. The court said that "under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press–Enterprise [I]* and its predecessors." *Id.* at 47, 104 S.Ct. at 2216 (footnote omitted). Accord *United States v. De Los Santos*, 810 F.2d 1326, 1333 (5th Cir.), *cert. denied*, 484 U.S. 978, 108 S.Ct. 490, 98 L.Ed.2d 488 (1987). "[T]here can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Waller*, 467 U.S. at 46, 104 S.Ct. at 2215.

In a First Amendment case, *United States v. Valenti*, 987 F.2d 708 (11th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 289, 126 L.Ed.2d 238 (1993), the Eleventh Circuit considered whether "the district court erred in conducting closed [pre-trial] proceedings without first providing the public and press an opportunity to be heard, and articulating specific findings that justified closure of portions of the underlying criminal proceeding." *Id.* at 711.[58] The court stated, "[I]n determining whether to close a historically open process where public access plays a significant role, a court may restrict the right of the public and the press to criminal proceedings only after (1) notice and an opportunity to be heard on a proposed closure; and (2) articulated specific 'findings that closure is

---

the right to a speedy and public trial." The "public trial" clause was made applicable to state prosecutions by *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948).

**58.** The proceedings in question were a partially ex parte closed bench conference between the prosecutor and the court which resulted in a postponement of the trial date; two ex parte in camera motions by the government; the govern-

ment's in camera motion; a closed conference; a closed bench conference in open court; two ex parte closed bench conferences with the government; three closed bench conferences; an in camera proceeding in which the court heard testimony of an Assistant United States Attorney; and an in camera government motion seeking protection of discovery materials. *Valenti*, 987 F.2d at 710–11.

essential to preserve higher values and is narrowly tailored to serve that interest.' " *Id.* at 713 (quoting *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824). The court also relied upon *Newman v. Graddick,* 696 F.2d 796 (11th Cir.1983).

Contrary to the Times's (sic) argument, we do not interpret *Press–Enterprise I* to require a trial court to articulate findings that a closed bench conference is necessary and narrowly tailored to preserve higher values *before* a closed bench conference occurs. Instead, *Press–Enterprise* notes that a court may conduct an *in camera* conference on the record where the "constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time." *Press–Enterprise I,* 464 U.S. at 512, 104 S.Ct. at 825. In this process, the trial court balances the right of access against the interest in maintaining a sealed transcript. *Press–Enterprise I,* 464 U.S. at 512, 104 S.Ct. at 825. In placing a duty on the trial court to balance competing interests and make findings *after* the occurrence of a closed bench conference, the Court in *Press–Enterprise I* articulated a workable procedure to accommodate the public's right of access and the long recognized authority of a trial court to conduct bench conferences outside of public hearing. See *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 609 n. 25, 102 S.Ct. 2613, 2620, n. 25, 73 L.Ed.2d 248 (1982) (holding that a trial court has traditional authority to conduct *in camera* conferences); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 598 n. 23, 100 S.Ct. 2814, 2839 n. 23, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring) (stating that "the presumption of public trials is, of course, not at all incompatible with reasonable restrictions imposed upon courtroom behavior in the interest of decorum," including the exclusion of the public and the press from conferences at the bench and in chambers where such conferences are distinct from trial proceedings); *United States v. Gurney,* 558 F.2d 1202, 1210 (5th

Cir.1977) (holding that "bench conferences between judge and counsel outside of public hearing are an established practice, ... and protection of their privacy is generally within the court's discretion.... Such conferences are an integral part of the internal management of a trial, and screening them from access by the press is well within a trial judge's broad discretion"), *cert. denied, Miami Herald Publishing Co. v. Krentzman,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978), *overruled in part on other grounds, Nixon v. Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Thus, we find no error in the district court's exercise of its traditional authority to conduct closed bench conferences. Our holding on this issue is bolstered in this case because the district court afforded the *Times* an opportunity to be heard on the release of the transcripts within a reasonable time.

*Valenti,* at 713–14 (emphasis in original).

The *Waller* court found that where a defendant's Sixth Amendment right to a public trial was violated, the relief afforded should be appropriate to the violation. *Waller,* 467 U.S. at 50, 104 S.Ct. at 2217. The court ordered a new and public suppression hearing, stating "[a] new trial need be held only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." *Id.*

 The court assumes, without deciding, that the closed proceedings in this case actually violated the petitioner's Sixth Amendment right to a public trial. In the absence, however, of any suggestion that new open proceedings would likely produce a substantial change in the parties' positions, making the transcript of those proceedings available to the press and public satisfied the *Waller* and *Valenti* requirements of practical common sense relief "appropriate to the violation" and consistent with the policy considerations which form the basis for the right to a public trial.[59]

---

**59.** See *Estes v. Texas,* 381 U.S. 532, 588, 85 S.Ct. 1628, 1662, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring) ("Essentially, the public-trial guarantee embodies a view of human nature, true as

#### c. Pretrial Publicity.

The petitioner claims that he was denied a fair and impartial trial because of prejudicial pretrial publicity. He argues that publicity concerning the charges against him and the trial of those charges saturated the community and made the opportunity for a fair trial virtually impossible. (R. 1–3, pp. 27–424) Mr. Hunt asserts that news stories concerning the investigation, charges, and pretrial proceedings in the area of Montgomery, Alabama, generated three volumes of exhibits. There was testimony from local news representatives that the ethics violation, indictment, and trial of the Governor was the lead story for months preceding and during the trial. (R. 15, pp. 2941–2943, 2951, 2956, 2960, 2964, 2965, 2935) The coverage included strong editorials expressing subjective opinions of the writers concerning the petitioner's conduct. (R. 15, pp. 2923–2938; R. 1, pp. 156, 159, 168, 172)

The constitutional guarantee of a fair trial requires that a criminal defendant must be tried by a panel of impartial and indifferent jurors. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). When pretrial publicity has so prejudiced the community atmosphere surrounding a trial that an impartial jury cannot be seated, due process requires that a trial court must grant a defendant's motion for a change of venue. *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

The courts have evolved two different standards to evaluate claims that a criminal trial was so infected by pretrial publicity as to violate a defendant's fundamental rights. See *Coleman v. Zant,* 708 F.2d 541, 544 (11th Cir.1983). In order to meet the "actual prejudice" test, the petitioner would have to show that before trial at least one juror held the opinion that he was guilty and "could not have laid aside these preformed

opinions and 'render a verdict based on the evidence presented in court.'" *Id.* (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643). Under the "presumed prejudice" test, "[p]rejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." *Coleman v. Kemp,* 778 F.2d 1487, 1490 (11th Cir.1985). See also *Murphy v. Florida,* 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975); *Rideau,* 373 U.S. at 727, 83 S.Ct. at 1420; *Mayola v. Alabama,* 623 F.2d 992, 996–97 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). It is the "relatively rare" case in which a conviction is vacated on grounds of presumed prejudice. See *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 47 L.Ed.2d 683 (1976); *Bundy v. Dugger,* 850 F.2d 1402, 1424–25 (11th Cir.1988), *cert. denied,* 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989).

Mr. Hunt does not specifically allege that he suffered actual prejudice and the record does not suggest there was any such prejudice. He argued to the Alabama Court of Criminal Appeals that he suffered "presumptive prejudice," and that appears to be the argument he makes here. Application of the "presumed prejudice" standard requires the court to look at the totality of the surrounding facts. *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). "[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." *Coleman v. Kemp,* 778 F.2d at 1537. "Prejudicial" publicity usually must consist of much

a general rule, that judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings"); *In re Oliver,* 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power."). In addition to ensuring that

judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. See *In re Oliver,* 333 U.S. 257, 270, n. 24, 68 S.Ct. 499, 506 n. 24, 92 L.Ed. 682 (1948); *Douglas v. Wainwright,* 714 F.2d 1532, 1541 (11th Cir. 1983), *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 606 (3rd Cir.1969).

more than stating the charge, and of reportage of the pretrial and trial processes. "Publicity" and "prejudice" are not synonymous.

The Alabama Court of Criminal Appeals, after reviewing the materials submitted in support of this claim, said:

> A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so "pervasively saturated" with prejudicial publicity so as to make the court proceedings nothing more than a "hollow formality." *Rideau,* supra. In fact, a great deal of media coverage tended to exonerate Hunt of the pending charges. Hunt's "excess campaign funds" or "political account" theory of defense received wide coverage.

*Hunt v. Alabama,* 642 So.2d at 1044. This court's review of the record leads it to agree with the Court of Criminal Appeals that Mr. Hunt was not, by pretrial prejudicial publicity, deprived of his right to trial before an impartial jury.

### 4. Failure of the Supreme Court to Sit as a Deliberate Body.

▮ The petitioner's ninth ground is that the Alabama Supreme Court failed to sit as a deliberative body as required by law in that the Chief Justice improperly failed to recuse himself; two justices failed to sit but were not recused; and another justice, who did sit and was not listed on the opinion, issued a dissenting opinion weeks after the petitioner's application for rehearing was denied. This ground has been exhausted.[60]

The petitioner has not in brief or oral argument suggested how the conduct of the Alabama Supreme Court prejudiced him in a Constitutional sense and this court discerns no such prejudice.

The record here reveals none of the interests condemned by the United States Supreme Court in *Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986).[61] This claim is meritless.

### V. Conclusion.

Having determined that the petitioner is entitled to no relief on any claim raised in this petition, the court will enter final judgment denying all relief and taxing costs against the petitioner. A separate judgment in conformity with this opinion will be entered contemporaneously herewith.

### JUDGMENT

In accord with the Memorandum of Opinion, interred contemporaneously herewith, it is hereby **ORDERED, ADJUDGED** and **DECREED:**

---

**60.** This issue was raised by motion for recusal of Chief Justice, by oral objection to the Supreme Court prior to oral argument, and in petitioner's Application for Rehearing. Relief was denied each time.

**61.** In *Lavoie,* the Supreme Court reversed a decision of the Alabama Supreme Court in a case in which, at the time the Alabama decision was rendered, a sitting justice, with almost identical interests to those of the plaintiffs in *Lavoie,* had two lawsuits against insurance companies which were similarly situated to the defendant. The court said,

> In *Tumey* [*v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) ], while recognizing that the Constitution does not reach every issue of judicial qualification, the Court concluded that "it certainly violates the Fourteenth Amendment ... to subject [a person's] liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a con-

clusion against him in his case." 273 U.S. at 523, 71 L.Ed. 749, 47 S.Ct. 437 [at 441].

> More than 30 years ago Justice Black, speaking for the Court, reached a similar conclusion and recognized that under the Due Process Clause no judge "can be a judge in his own case [or be] permitted to try cases where he has an interest in the outcome." *In re Murchison,* 349 U.S. 133, 136, 99 L.Ed. 942, 75 S.Ct. 623 [625] (1955). He went on to acknowledge that what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision." *Ibid.* Nonetheless, a reasonable formulation of the issue is whether the "situation is one 'which would offer a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true.'" *Ward v. Village of Monroeville,* 409 U.S. [57,] 60, 34 L.Ed.2d 267, 93 S.Ct. 80 [83 (1972) ].

*Lavoie,* 475 U.S. at 821–22, 106 S.Ct. at 1585.

1. the petition for the writ of habeas corpus is **DENIED**;

2. costs of this action are **TAXED** against the petitioner and in favor of the respondents.

## Appendix A

Record of Checks Written on "Friends of Guy Hunt, Guy Hunt Reserve," account at First Federal Savings and Loan in Cullman, Alabama.

| Date | Payee | Amount | Notation |
| --- | --- | --- | --- |
| 02/06/87 | Walker Brothers [62] | $25,156.53 | "Paid in Full" |
| 02/16/87 | Phil and Pat Estes | $3,200.00 | "For land, paid in full" |
| 03/03/87 | Elder Elmer Weaver | $2,000.00 | "Donation" |
| 03/04/87 | Keith Hunt | $300.00 | |
| | AmSouth Bank | $1,709.83 | |
| | Budget Insulation | $2,017.00 | |
| | First Alabama Bank | $5,669.00 | |
| | Crawford Welsh | $1,500.00 | |
| | Keith Hunt | $300.00 | |
| | Cullman Electric Coop. | $153.34 | |
| | Lamar Thomas | $349.00 | "Machine work" |
| | Basch Brothers [63] | $4,250.00 | |
| | Crawford Welsh | $1,500.00 | |
| | Dan McGuff | $1,000.00 | |
| | Keith Hunt | $300.00 | |
| | Nell Skidmore Campaign | $500.00 | |
| | Crawford Welsh | $1,000.00 | |
| | Keith Hunt | $500.00 | |
| | Rhodes Furniture | $3,220.07 | "Keith's Furniture" |
| | Mike Pinion | $1,850.00 | "Machine work" |
| | Allen Hassle | $2,086.72 | "Posts and wire" |
| 06/08/87 | Clifford Cobbs | $1,150.00 | "Cattle" |
| 06/10/87 | Guy Hunt [64] | $1,000.00 | |
| | Basch [65] | $246.05 | |
| | Cullman Stockyards | $480.00 | "Cow" |
| | AmSouth Bank [66] | $2,300.00 | |
| 06/27/87 | Clifford Cobbs | $1,777.50 | "Cows" |
| 07/13/87 | Guy Hunt [67] | $1,500.00 | |
| | Keith Hunt | $4,000.00 | "Advance" |

62. Walker Brothers is a retail building supply company. (R. 36, p. 606) This check was in payment for building supplies purchased by Mr. Hunt for a dwelling house. (R. 36, pp. 607–08)

63. This check was for the purchase of a lawn mower from Ralph Basch, Jr., owner of a True Value Hardware store in Cullman, Alabama. (R. 35, pp. 590–92)

64. Mr. Frye testified that this $1,000.00 was deposited into Mr. Hunt's personal account at AmSouth Bank. (R. 35, p. 510) "Guy Hunt's personal account at AmSouth Bank" is account number 38191202. The authorized signatories on the account were Mr. Hunt, Mrs. Helen C. Hunt (the petitioner's wife), and Lynn Hunt Brock (his daughter). (R. 35, p. 405) It is this account which is intended when the court refers to the petitioner's "personal account." This $1,000.00 check was used to cover a check written on the personal account to Stockton, Whatley and Daven, mortgage bankers who held a mortgage on property owned by the petitioner. (R. 35, p. 535)

65. According to Mr. Frye this check was endorsed "Greencraft Mowers." (R. 35, p. 510)

66. Mr. Frye testified that this check was made for payment of a credit card account. (R. 35, p. 511)

67. Mr. Frye traced this check into the petitioner's personal account at AmSouth where it prevented an overdraft which would otherwise have resulted from checks written on the personal account during the period from June 19, 1987, to July 19, 1987. (R. 35, p. 511) Included in those were checks to Stockton, Whatley and Daven, mortgage bankers; Cullman Electric Co-Op.; Amway Distributing Group; Helen Hunt; Ford Motor Credit; Herschel Patterson, for wire and posts; Bill Williams, for labor on a fence; and an automatic debit to Lamar Life Insurance. (R. 35, pp. 537–38)

| Date | Payee | Amount | Notation |
|------|-------|--------|----------|
| | Keith Hunt | $125.00 | "Expense" |
| | Keith Hunt | $1,870.36 | |
| | Cullman Stockyards | $590.00 | "Cow" |
| 08/19/87 | Federer's [68] | $1,192.50 | |
| | Gamecock Motel | $162.50 | |
| | Susan Griffin | $679.00 | "House Payment" |
| | Keith Hunt | $6,006.00 | "For deposit only, Keith Hunt" |
| | Keith Hunt | $765.00 | |
| | Susan Griffin | $679.00 | "House Payment" |
| | Susan Griffin | $679.00 | |
| | Carla Lockwood [69] | $226.65 | "Tires for the car" |
| | J.L. Laberto | $500.00 | |
| | Johnny Still | $1,000.00 | "Loan" |
| | Lewis Smith | $700.00 | |
| | Farm & Home Admin. | $3,014.00 | "Lynn Gaddis Loan" [70] |
| | (left blank) | $485.00 | |
| | Keith Hunt | $330.00 | "Expenses" |
| | Billy Jackson | $519.00 | "Keith Hunt's Account" |
| | Maholn Hunt | $1,021.65 | "Keith Hunt" |
| | Universal Protection Sys. | $101.44 | |
| | Ford Motor Credit | $754.46 | "Lease" |
| | Carl Brock [71] | $1,500.00 | "Reimbursement of deposit 4/11/88" |
| 06/17/86 [72] | Keith Hunt | $200.00 | "Additional salary, week ending 4/22/88" |
| | Keith Hunt | $200.00 | "Salary" |
| | Keith Hunt | $200.00 | |
| | Keith Hunt | $188.02 | |
| | Ford Motor Credit | $754.46 | |
| | Keith Hunt | $200.00 | "Salary" |
| | Carla Lockwood | $200.00 | |
| 07/21/88 | Cash [73] | $500.00 | |
| | Keith Hunt | $200.00 | "Salary" |
| | Keith Hunt | $200.00 | "Salary supplement" |
| | Keith Hunt | $400.00 | "Salary supplement" |
| **Total:** | | $96,159.08 | |

## Appendix B

Record of Checks Written on "Friends of Guy Hunt," account at AmSouth Bank in Cullman, Alabama after $100,000.00 was returned to the Hunt Transition and Inaugural Fund, Incorporated Account at the Union Bank and Trust Company in Montgomery.

68. "Federer's" is a farm supply store. (R. 35, p. 513) This check was endorsed "Federer's Farm Services" (R. 35, p. 513) and was for the purchase of steel posts, barbed wire, and creosote posts by Mr. Hunt. (R. 35, pp. 587–88)

69. This check was endorsed "For deposit only— thanks a lot." (R. 35, p. 514)

70. Lynn Gaddis is Mr. Hunt's daughter. (R. 35, p. 515)

71. Carl Brock is Mr. Hunt's son-in-law. (R. 35, p. 516)

72. Mr. Frye testified that although this check was dated June 17, 1986, the number was in sequence with checks that were written in 1988. (R. 35, p. 516)

73. This check was deposited into Mr. Hunt's personal account at AmSouth Bank. (R. 35, p. 517) This amount, together with two other deposits (see footnotes 71 and 83) was used to cover checks written on the petitioner's personal account during the period of June 22, 1988, to July 22, 1988, being checks to Euel Dees, for survey work; Bill Williams, for fence building; and Cultured Marble of Cullman. (R. 35, pp. 538–39)

**Appendix B—Continued**

| Date | Payee | Amount | Notation |
|------|-------|--------|----------|
| 12/23/87 | Guy Hunt [74] | $1,000.00 | "For deposit only" |
| 07/21/88 | Guy Hunt [75] | $700.00 | "For deposit only" |
| 08/13/88 | Guy Hunt [76] | $100.00 | |
| | | $120.00 [77] | |

**Total:** $1,920.00

**Appendix C**

Record of withdrawals from the "Friends of Guy Hunt"/"Guy Hunt or Mrs. Guy Hunt" savings account at Cullman Savings and Loan in Cullman, Alabama.

| Date | Debit Amount | Payee |
|------|--------------|-------|
| 10/16/87 | $30,000.00 | Cashier's check payable to "Guy Hunt, Route 2, Box 78, Holly Pond, Alabama."[78] |
| 12/05/87 | $16,150.00 | Cashier's check payable to "Merchants Bank." [79] |
| 04/13/88 | $5,000.00 | Cashier's check payable to "Friends of Guy Hunt, care of Guy Hunt, Route 2, Box 78, Holly Pond, Alabama." [80] |
| 04/30/88 | $12,000.00 | Cashier's check payable to "Friends of Guy Hunt, care of Guy Hunt, Route 2, Box 78, Holly Pond, Alabama." [81] |
| 07/18/88 | $2,000.00 | Cashier's check made payable to "Friends of Guy Hunt, care of Guy Hunt, Route 2, Box 78, Holly Pond, Alabama." [82] |
| 10/15/88 | $10,000.00 | Cashier's check payable to "Guy Hunt." [83] |

74. This check was deposited into Mr. Hunt's personal account at AmSouth Bank. (R. 35, p. 522) After this $1,000.00 deposit was made, checks totaling $943.04 were written on the personal account. They were: $200.00 to cash, $481.50 to Wholesale Jewelry, $261.53 to the Revenue Commissioner. (R. 35, p. 534)

75. This check was deposited into Mr. Hunt's personal account at AmSouth Bank (R. 35, p. 522) and, together with two other deposits (see footnotes 69 and 83) prevented an overdraft that would have resulted from checks written on the personal account during the period from June 22, 1988, to July 22, 1988. (R. 35, p. 534)

76. This check was deposited into the "Friends of Guy Hunt/Guy Hunt Reserve" account at First Federal Savings and Loan in Cullman, Alabama. (R. 35, p. 522) This is the same account in which check number 103 for $100,000.00 was deposited.

77. No additional information was available on this check since the actual check was never recovered. (R. 35, p. 522)

78. This cashier's check was endorsed by Mr. Hunt and deposited into his personal account at AmSouth Bank (R. 35, p. 525) to cover two checks written on the personal account: $24,-999.00 to the Internal Revenue Service for 1986 federal income taxes and $4,536.00 to the Alabama Revenue Service for 1986 state income taxes. (R. 35, p. 540)

79. This check was used to make a payment on a real estate mortgage of 67.93 acres owned by the petitioner. (R. 35, p. 525–526)

80. This check was endorsed "Friends of Guy Hunt, Guy Hunt Reserve, Guy Hunt" and deposited into the First Federal Savings and Loan account in Cullman, Alabama, the same account in which check number 103 from the Union Bank and Trust Company for $100,000.00 was deposited. (R. 35, p. 527)

81. This cashier's check was endorsed "For deposit only" and deposited into a "Friends of Guy Hunt" account at First Alabama Bank. (R. 35, p. 527)

82. This cashier's check was endorsed "Friends of Guy Hunt by Guy Hunt" and deposited into "Guy Hunt's personal account at AmSouth Bank." (R. 35, p. 528) This deposit, together with two other deposits, (see footnotes 69 and 71) prevented an overdraft that would have resulted from checks written on the personal account during the period from June 22, 1988, to July 22, 1988. (R. 35, p. 534)

83. This cashier's check was endorsed "Guy Hunt" and deposited into the personal account of Guy Hunt at AmSouth Bank. (R. 35, p. 528) This deposit was necessary to cover checks written on the personal account during the period from September 23, 1988, to October 27, 1988: $7,427.00 to the Internal Revenue Service for 1987 federal income taxes, and $138.00 to the Alabama Revenue Service for 1987 state income taxes. (R. 35, p. 541)

| Date | Debit Amount | Payee |
|---|---|---|
| 01/03/89 | $17,000.00 | Cashier's check payable to "Guy Hunt or Mrs. Guy Hunt, Route 2, Box 78, Holly Pond, Alabama." [84] |
| 03/24/89 | $3,500.00 | Cashier's check payable to "Guy Hunt." [85] |
| 05/10/89 | $1,000.00 | Cashier's check payable to "Guy Hunt." [86] |
| 12/29/89 | $11,700.00 | Cashier's check payable to "Guy Hunt or Mrs. Guy Hunt." [87] |
| **Total:** | $108,350.00 | |

## APPENDIX D

### IN THE SUPREME COURT OF ALABAMA

June 24, 1994

1930501 *Ex parte Harold Guy Hunt (Re: Harold Guy Hunt v. State)*

*On Application for Rehearing*

MADDOX, Justice (dissenting).

This is the case involving the conviction of Governor Guy Hunt for violating the Alabama Code of Ethics for Public Officials, § 36–25–5, Ala.Code 1975 ("the Ethics Act"). When the majority of this Court released its opinion on April 21, 1994, affirming the judgment of the Court of Criminal Appeals, I was not listed as having participated in the consideration of the opinion. The purpose of this opinion is to state, in general, why my name was not listed on the opinion when it was initially released, and in addressing that question I will answer, generally, the questions raised by Governor Hunt on his application for rehearing that relate to that issue.

I also write for the further purpose of stating why I must respectfully disagree with the majority's opinion affirming Hunt's judgment of conviction and its denial of his application for rehearing, and the reasons why I think that the conviction should be overturned.

### I

First, let me state that I agree with petitioner's counsel who states in his application for rehearing that "[t]his case was and is of extreme importance to the people of Alabama, not just present citizens, but future citizens as well...."

Although my vote on original deliverance would not have affected the outcome of the case, because there were six Justices who

84. This cashier's check was endorsed "Guy Hunt" and deposited into the personal account of the petitioner at AmSouth Bank. (R. 35, p. 528) It was used to cover a check written on the personal account during the period of December 21, 1988, to January 1, 1989, to Merchants Bank for $16,041.77 for the renewal of a note on a mortgage loan on property owned by Mr. Hunt. (R. 35, p. 542)

85. This cashier's check was endorsed "Guy Hunt" and deposited into the petitioner's personal account at AmSouth Bank. (R. 35, p. 528–529) This deposit was necessary to cover checks written on the personal account during the period from March 23, 1989, to April 21, 1989, consisting of: $500.00 to Walker Brothers, a building and supply company in Cullman; $172.00 to Zeb Nelson for barn labor; $105.45 to Simco Cleaners; $375.00 to Lamar Thomas; $1000.00 to N.C. Arnold and Sons, a lumber company; $220 to Cullman Electric Co-Op.; $700.00 to Dan Hopper for barn labor; $1,864.00 to Cullman Savings and Loan; $183.43 to South Central Bell; $284.68 to Farm Credit Bank of Texas; and $700.00 to Alfa Insurance. (R. 35, p. 544)

86. This cashier's check was endorsed "Guy Hunt" and deposited into his personal account at AmSouth Bank. (R. 35, p. 529) It covered checks written during the period from April 21, 1989, to May 19, 1989, consisting of: $284.68 to Farm Credit Bank of Texas; $654.00 to Keith Hunt; $1,864.00 to Cullman Savings and Loan; $111.00 to AmSouth; $175.00 to Dan Hopper; $100.00 to Charles Adam for Congress Campaign; $154.28 to South Central Bell; and $390.00 to Gary Gibbs for hay baling. (R. 35, p. 545)

87. This cashier's check was endorsed "Guy Hunt" and deposited into the personal account at AmSouth Bank. (R. 35, p. 529) The deposit covered a check of $16,297.23 to the Merchants Bank for payment on a mortgage loan. (R. 35, p. 546)

either concurred with the opinion or concurred in the result of the opinion, and although my vote now does not change the result reached by a majority of this Court, I never entertained any thought of not expressing my views on the applicable law in this case. I now take this opportunity to express my views on the applicable law as I understand that law to be, believing generally, as Thomas Jefferson did, that a judge, especially in a case like this, should write an opinion so as to "throw himself in each case on God and country; both will excuse him for error and value him for honesty."[1] In a case of this nature, I clearly believe that Jefferson's thoughts are applicable.

Because this case involved a sitting Governor, and because it involved a Governor who was a member of one party, and the prosecutor was the member of another, there were charges and countercharges of partisan politics, and some of those charges persist. This has been a case that has attracted a great deal of public interest to be sure, but it must be decided on the principles of law that are applicable to it without regard to who the parties are, who represents them, or what the issues are.[2]

As I view the law of this case, the determinative question is not whether the State proved that the petitioner violated the Ethics Act; it appears to me that the State probably carried its burden in that respect. I think the determinative question is whether the State began the prosecution within three years after the offense was completed, as the law requires. Even assuming, however, that I am wrong on that issue, and that the prosecution was timely begun, there are other serious legal questions presented relating to the fairness of the trial, and of those questions I believe one with particular merit is whether the trial judge properly instructed the jury on the law relating to the use of excess campaign funds for personal use. Although I believe personally that no public official should ever use campaign funds for personal financial benefit, I think that the law applicable at the time the alleged offense was committed in this case did permit it, but that the law has now been amended to forbid it.

## II

Having stated generally what compels me to write, I now address the petitioner's assertion, in his application for rehearing, that his constitutional rights were violated because my name was not listed as participating in the original opinion in this case. He states in his application for rehearing:

"Under Amendment 328, Section 6.02(a) to the Constitution of Alabama of 1901, the Supreme Court is to consist of one chief justice and such other justices as prescribed by law. *Ala.Code*, § 12–2–1, provides that the Supreme Court shall consist of one chief justice and eight associate justices. Canon 3 of the Alabama Canons of Judicial Ethics provides that, 'The judicial activities of a judge take precedence over his other activities.' Canon 3C likewise provides for specific grounds for disqualification, none of which apply here. Petitioner was denied his right to due process under Article I, Section 6 to the Constitution of Alabama of 1901 and under the Fourteenth Amendment to the Constitution of the United States of America in that the Supreme Court failed to follow the law of the State of Alabama and sit as a deliberative body as required by law, in that three justices failed to sit without recusing themselves, and without any legitimate basis for absence or disqualification. The judicial process has been so prejudiced that the entire court should recuse

---

**1.** William O. Douglas, *The Dissent: A Safeguard of Democracy*, 32 J.Am.Judicature Soc'y 104, 106 (1948).

**2.** When I took my first oath of office in October, 1969, I made the following pledge to those attending my investiture ceremony, and I have used this pledge in political campaign materials when I have had opposition:

"On the bench, I shall faithfully and diligently discharge my duty by handling the people's business with dispatch and justice—according to the laws and constitution which we, the people, have adopted—and not according to any particular philosophy which might appear more expedient or more desirable."

itself and an independent court be appointed to rehear this cause."

In his brief in support of the application for rehearing, the petitioner argues his legal position, in part, as follows:

"Under Amendment 328, § 6.02(a) to the Constitution of Alabama of 1901, the Supreme Court is to consist of one Chief Justice and such other Justices as prescribed by law. *Ala.Code,* § 12–2–1, provides that the Supreme Court shall consist of one Chief Justice and eight Associate Justices. Canon 3 of the Alabama Canons of Judicial Ethics provides that, 'The judicial activities of a judge shall take precedence over his other activities.' Canon 3C provides for specific grounds for disqualification of judges, none of which apply here with the exception of the Chief Justice. This Court held in *Matter of Sheffield,* 465 So.2d 350, 355 (Ala.1984), that the Canons of Judicial Ethics 'are not merely guidelines for proper judicial conduct. It is well-settled that the Canons of Judicial Ethics have the force and effect of law.'

"This case was and is of extreme importance to the people of Alabama, not just present citizens, but future citizens as well because it will be looked at to determine whether our judicial system really works. Can our judicial system be above politics? Emotion? Can it be free of predilection?

"*Ala.Code* 1975, § 12–3–17, provides that in the absence or disqualification of a judge a majority can hold court. However, the Legislature clearly contemplated legitimate absences and not ones for personal reasons. That a Justice simply does not want to sit, whether because of some other personal activity, or because he is a candidate for re-election, or because he does not feel like sitting on a particular case would not be a proper ground for failing to sit. In the absence of a legitimate ground for disqualification or some serious illness or family tragedy, a judge has a duty to sit. See, *Ex parte Hill,* 508 So.2d 269, 271 (Ala.Civ.App.1987). While the Court of [Civil] Appeals stated that the Alabama Canons of Judicial Ethics have affected the obligation of a judge to sit in a particular case, the duty to sit has not been eliminated in the absence of some ethical consideration justifying recusal.

"In this case, three justices for unexplained reasons chose to not participate in the decision of this case. Justice Houston simply did not appear for oral argument and is listed in the opinion as having not sat, Justice Kennedy was present for oral argument, but nevertheless is listed in the opinion as 'not sitting,' and Justice Maddox, who did sit for the oral argument and in fact vigorously participated, is not even listed on the opinion. While it is well-settled that a State has no obligation to provide for an appeal of a defendant in a criminal case, it is equally settled that where a State establishes an appellate process, it must follow that process. Here, Guy Hunt has been denied his right to due process under Article I, Section 6 to the Constitution of Alabama of 1901 and under the Fourteenth Amendment to the Constitution of the United States. Petitioner had a right to have this Court sit as a deliberative body to decide his case unless there were legitimate grounds for absence or disqualification. With the exception of the Chief Justice, there appear to have been none. The judicial process has been so prejudiced, the entire Court should recuse itself and an independent Court appointed to rehear this case."

First, let me state that I had never intended not to participate in the decision in this case, but there were many facts and circumstances surrounding the release of the opinion that affected my decision to tell the clerk to leave my name off the original opinion in this case, and to allow me to file my opinion at a later date. Suffice it to say that I had legitimate and just reasons to support my decision not to be listed as participating in the original decision in this case at that time, but this is not the time, nor is this opinion the place, for me to list those reasons generally or specifically, except to say that at the time the opinion was released, I had not had sufficient time to research the law and prepare an opinion that I would want to have published.

## III

I have carefully read the lengthy opinion of the Court of Criminal Appeals, and I have also studied carefully the briefs of the parties, including an amicus brief filed by several state legislators. I participated in the oral arguments of this case and asked several questions during those arguments on the two legal issues that compel me to disagree with my fellow Justices. My decision to file my dissenting views did not come easily, because there are 11 Judges and Justices who disagree with my views of the law, but I must respectfully disagree with them. Even if my dissenting views are not accepted by a tribunal with the power to modify the majority's decision in this case, I believe that dissenting opinions have their place. I have noted on other occasions that "[a] dissent in a court of last resort is an appeal to the brooding spirit of the law, to the intelligence of a future day, when a later decision may possibly correct the error into which the dissenting judge believes the court to have been betrayed." [3] I believe that the opinions of the Court of Criminal Appeals and of this Court are erroneous. That is why I write.

I asked several questions during oral argument, most of them directed at the specific acts of misconduct that the State claimed that the petitioner did, when he did them, and why an instruction on the Fair Campaign Practices Act was given when the State contended from the beginning that the "Friends of Guy Hunt" accounts made the subject of the indictment were "bogus" or "money laundering" accounts and not "campaign accounts." Other questions I asked were directed to when the evidence showed the elements of the Ethics Act offense were completed so that the statutory limitations period would have begun to run.

Although the petitioner made forceful arguments on several other legal issues, including arguments that he was selectively prosecuted and that the evidence was insufficient to convict him of violating the Ethics Act, I address only the two issues presented by the petitioner that appealed to me as having such

merit that I was convinced that the conviction should be reversed. The issues I address are: (1) the running of the limitations period on the charge laid in the indictment, and (2) the instruction of the trial court on the personal use of campaign funds. In addressing only these two issues, I do not address whether the petitioner was guilty or not guilty of the charges laid against him. A jury found him guilty, and the evidence appears to be sufficient to support that finding. I write only to say that I believe that the State did not prosecute the offense within three years of the date when the offense occurred and that I think the trial judge incorrectly instructed the jury on the use of campaign funds, so that the petitioner would be entitled to a new trial even if the prosecution were not barred by the statute of limitations. Naturally, I express no view on whether excess campaign funds should or should not be used for personal purposes, that is a political question. I express only my view that *at the time of the alleged offense,* the law permitted such use, although the law has now been amended.

## IV

The petitioner was charged, in Count I of the indictment, with a violation of the Ethics Act, § 36–25–5, Ala.Code 1975, which prohibits a public official from using his or her office for "direct personal financial gain." In Counts II through XIII, he was charged alternatively with theft, receiving stolen property, and conspiracy, but those charges were dismissed by the trial court on the ground that the statute of limitations barred prosecution of those charges. I note that each charge in the indictment seems to be based upon the same alleged wrongful acts or conduct.

At oral argument, when I asked the State's attorney to state the specific acts of misconduct that formed the basis of the charge, he said, in substance, that the petitioner solicited funds from contributors to be sent to a nonprofit corporation, that some of the solicited funds were not deposited into the account set up for the receipt of the inaugural

---

**3.** *Auto–Owners Ins. Co. v. Hudson,* 547 So.2d 467, 469 (Ala.1989) (Maddox, J., dissenting) (quoting Chief Justice Charles Evans Hughes, as quoted by William O. Douglas, *The Dissent: A Safeguard of Democracy,* 32 J.Am.Judicature Soc'y 104, 106 (1948)).

funds but were deposited instead into an account at Union Bank and Trust Company styled "Friends of Guy Hunt," and that those funds in the Union Bank "Friends of Guy Hunt" account were later transferred to three separate "Friends of Guy Hunt" accounts in various other banks. The State's attorney, when questioned about the nature of the several "Friends of Guy Hunt" accounts, variously described them as "bogus" accounts or "money laundering" accounts. As I understand the state's position, it was that the petitioner solicited funds for a nonprofit agency, caused them to be transferred into "bogus" accounts, and received a "direct personal financial gain as a result."

The petitioner did not deny the fact that the office of Governor, to which he had just been elected, was used to raise funds and that the various accounts were established, but he argued before the trial court, before the Court of Criminal Appeals, and before this Court, that the funds that he used, and which were the subject of the indictment upon which he was convicted, were "campaign funds" and that the Fair Campaign

Practices Act, § 17–22A–1 et seq., Ala.Code 1975, as it existed at the time the funds were used, allowed campaign funds to be used for any lawful purpose, including a personal purpose, that is, he argued that campaign funds were available for personal use.

Much of the evidence and many of the arguments before the trial court and before the appellate courts were built around the characterization of the several "Friends of Guy Hunt" accounts. Were they, in fact, "campaign accounts," as contended by the petitioner, or were they "bogus" or "money laundering" accounts as contended by the State? The jury, insofar as I can determine, was never asked to make a decision about that issue, even though there was a lot of evidence, and several legal arguments made, regarding the question.

Although I cannot find that the jury made a factual determination as to whether the funds were inaugural funds or campaign funds, the State's attorney, during oral argument, said that he did not believe the jury ever thought the funds were campaign funds.[4] The Court of Criminal Appeals spe-

4. The following occurred during oral argument, when I questioned the State's attorney:

"Q. You don't believe that you could have prosecuted the defendant for misuse of campaign funds had you brought a prosecution within the time—within the three years—with regard to violation of the Fair Campaign Practices Act?

"A. Your Honor, I'm not sure I understood your question. It would be difficult to bring an ethics violation under the Fair Campaign Practices Act.

"Q. The judge charged that it was illegal to use campaign funds for personal use. You're telling me the reason why the attorney general didn't try and get an indictment on the Fair Campaign Practices Act is because those were not campaign funds, is that what you're telling me?

"A. Well, no, sir, that's not the reason that we didn't bring it under the Fair Campaign Practices Act. The reason that we proceeded the way we are—now you're getting into some thoughts, but I don't mind telling you, Judge—is that because we didn't view this as anything other than a use of office by the defendant to obtain direct personal financial gain. We never have viewed this money as campaign money. He wants this Court to conclude it is even though there is no evidence whatsoever that it is. It's just not.

"Q. The reason I'm asking these questions is the biggest point I see that the defendant makes in this case is that an instruction to the jury with regard to the use of campaign funds for personal use as affecting the outcome of the case—

"A. An instruction that he asked for, Judge; he just didn't get the one he wanted. *He wanted the court to pardon him by giving an improper construction of that act.* What Judge Thomas did and what the Court of Criminal Appeals did was they read the Fair Campaign Practices Act and the Alabama Ethics Act *in pari materia.*

"Q. Did he object to it?

"A. Pardon me, sir.

"Q. Did he object to it?

"A. He objected to the one he got, yes, sir, but he asked for an instruction.

"Q. You don't think that raised it?

"A. Oh, I understand clearly, Your Honor, that whether or not Judge Thomas's instruction was proper is a matter that is before this Court. We just argue that it was a proper instruction, and, consistent with the facts adduced at trial, he had to give it, because of the way the defense defended this case, not because of anything that the State did. They needed an instruction at the point in time that they had injected the issue into the case, through argument, Judge, not through fact, that this was campaign funds. And they

cifically determined that the funds were not campaign funds. That Court stated that "the trial court's instruction on the Fair Campaign Practices Act was a correct statement of the law," because, the Court said, "we find that the funds in question in this case were solicited on behalf of a non-profit corporation, after Hunt had been elected, and so were not 'excess campaign funds.'" *Hunt v. State,* 642 So.2d 999, 1014 (Ala.Crim.App.1993).

Similarly, the majority of this Court found that the funds involved were not "campaign funds." In addressing the petitioner's argument on the selective prosecution issue, the majority said:

> "The essence of Hunt's arguments on these issues is that the funds he used for his direct personal financial gain were campaign funds. Hunt argues that his prosecution was selective because numerous other public officials had used excess campaign funds for direct personal financial gain and were not prosecuted. Hunt argues that his prosecution should have been barred by principles of equitable estoppel and that his prosecution amounts to an ex post facto application of the law because, he says, for years the Ethics Commission and the attorney general had told people that spending campaign funds for personal use was not illegal so long as the one using the funds treated them as income and paid taxes on that income. This argument might have some force if the funds involved were, in fact, campaign funds. *However, the facts show that the funds used by Hunt were not campaign funds, but that they were, instead, funds solicited by and contributed to a nonprofit charitable corporation.*"

(Emphasis added.)

It appears, therefore, that both a majority of this Court and the Court of Criminal Appeals have determined, as a matter of law, that the funds involved here were not "campaign funds." If that is true, as both Courts

have held, and if the wrongful conduct made the subject of the indictment was the diversion of funds that were solicited for a nonprofit corporation, then it would appear that the wrongful act occurred, and the offense was complete, when the funds were deposited into the "Friends of Guy Hunt" account at Union Bank and Trust Company. In other words, if as both appellate courts have determined, the funds involved were not campaign funds, then the offense for which the petitioner was convicted occurred at the time he gained such control over the funds that he had received a "direct personal financial gain" as a result, and if the petitioner used the funds that were diverted to what the State's attorney describes as "bogus" or "money laundering" accounts, then an offense occurred and was complete when the petitioner had such control and power over the funds that he had a benefit. As I view it, the question is: when did the petitioner use his office for "direct personal financial gain?"

The State seems to argue inconsistently. In arguing the sufficiency of the evidence to convict, the State says that the petitioner solicited the funds, caused them to be transferred into "bogus" accounts, and he used them. The State argues that the signatories to the "Friends of Guy Hunt" accounts were hired by the petitioner, and were under his direction and control, and that each of the alleged wrongful acts was committed by him or by those two agents. Consequently, the State argues that the petitioner committed the alleged wrongful acts and was guilty. On the other hand, the State, in arguing against the application of the statute of limitations defense, says that the petitioner did not have a "direct personal financial gain" until he actually withdrew funds in December 1989, although they had been diverted into the "bogus" or "money laundering" accounts much earlier. In effect, says the State, the petitioner had sufficient control over the funds to have them transferred into "bogus" accounts, but once they were transferred did not have such control that he received a

---

argued it at the open, and they argued it at the end. *But I don't believe, if you're asking me for my personal opinion, Judge, that the jury ever thought for one second that this was campaign money,* because it wasn't cam-

paign money coming in and it wasn't used for any campaign purpose and because there was · an existent real campaign account open...."
(Emphasis added).

"direct personal financial gain." The State argues, therefore, that the offense was not complete until the later date, which was within the period of limitations.[5]

The trial court recognized that the limitations period had run on the theft and related charges because the offenses were complete when the petitioner had such control of funds that he could be said, in law, to have appropriated them to his own use. The trial court stated in dismissing the theft and theft-related charges:

> "It's the Court's opinion that due to the elements of the offense of theft that any *control or gain*, based on the Defense's proof of a 1988 change of the account was done, takes it outside the statute of limitations and I hereby grant your motion to dismiss on that."

(Emphasis added.)

Did the State not use the same evidence to prove "control or gain" on the ethics charge that it had used to show the petitioner's guilt on the other charges? It appears to me that it did. If the petitioner had such "control or gain" over the funds in November 1988 that the theft and related offenses would have occurred by that time, why did that same evidence not prove sufficient "control or gain" to amount to a "direct personal financial gain" to the petitioner in regard to the ethics charge? The answer, of course, is that it would be sufficient. The trial court seemed to rule inconsistently on this point, and either wittingly or unwittingly used the words "control or gain" in dismissing the theft and related charges, but refused to dismiss the ethics charge on the same ground. He seemed to think that the provisions of the Fair Campaign Practices Act somehow required him to handle the ethics charge differently. I think the State, by its argument, led the learned trial judge into error. If, as contended by the State, the funds were not "campaign funds," then there was no need to be concerned, for statute of limitations purposes, with the provisions of the Fair Campaign Practices Act. In any event, I believe that the words "control or

gain" are synonymous with the words "direct personal financial gain" contained in the Ethics Act, § 36–25–5, Ala.Code 1975, and I conclude that if the theft and related offenses were barred by the three-year statute of limitations, so was the ethics charge.

The majority, relying on *Lambert v. Wilcox County Comm'n*, 623 So.2d 727, 730 (Ala. 1993), holds that "[t]he crime was not complete when Hunt became the sole signatory on the account containing funds raised for his inauguration" because "[a]lthough Hunt was in control of the funds at that time, he had not received an improper 'direct personal financial gain.'" The majority, therefore, holds that gaining exclusive control over funds is not a "direct personal financial gain" under § 36–25–5, Ala.Code 1975. I think that the majority grievously errs in this interpretation of the holding in *Lambert* and in applying the "direct personal financial gain" provisions of the Ethics Act.

In *Lambert*, the plaintiffs sought to disqualify one of the county commissioners from voting on a sales tax increase that would benefit the Wilcox County Board of Education, because the Board employed the commissioner as a bus driver. The commissioner's benefit from action he took as an officeholder was held not to be "direct personal financial gain," but I think a tax increase that benefits the school board that employs the officeholder who voted for the tax cannot be compared to the placing of funds solicited by the officeholder on behalf of a non-profit corporation into a personal bank account over which the officeholder is the sole signatory. *Lambert* involves an interpretation of the word "direct" as opposed to the word "indirect." The line between *direct* and *indirect* personal financial gain might not be so distinct in many cases, but, with all due respect to my colleagues, I cannot see how a person can have sole possession of a fund and sole control of the disposition of that fund and still not have realized a "direct personal financial gain" in the process, unless the funds were held in some capacity as a trustee agent or custodian.

---

**5.** Although the State argued unsuccessfully in the trial court that a six-year statute of limitations was applicable, the limitations period that applied to this case was three years.

Based on that conclusion, I would hold that when the petitioner became the sole signatory of the "Cullman Friends" bank account on November 12, 1988, he, at least at that point, if not earlier, received a "direct personal financial gain" as defined by the statute. Consequently, I believe that the statutory limitations period had began to run at least as of November 12, 1988, because on that date the petitioner had such "gain" and "control" over the funds that the elements of the Ethics Act were then complete. I would reverse the conviction and render a judgment for the petitioner, not because he was innocent of violating the Ethics Act, but because the prosecution was not commenced within the time set out by law, and because the petitioner timely raised the defense of the statute of limitations.

V

Although I believe that the conviction should be reversed and a judgment rendered for the petitioner, I also address one other point, the giving of the instruction on the taking of excess campaign funds for personal use, because the holding in this case on that issue, I must respectfully say, is incorrect. The trial court stated in its instruction that "[t]he use of excess campaign funds for direct personal financial gain is, therefore, not a lawful purpose as that phrase is used in the Fair Campaign Practices Act."

The giving of that instruction, in my opinion, was reversible error. The petitioner contended before trial, during trial, and during the charge conference that he was entitled to have the jury find him not guilty if the jury found that the funds were campaign funds. While it would not have been improper for the trial court to instruct the jury on the petitioner's theory of the case and to have the jury decide whether the "Friends of Guy Hunt" accounts were "campaign" accounts, it was very prejudicial for the trial court to incorrectly instruct the jury. At the

time the petitioner used the funds that were made the subject of his prosecution, the Fair Campaign Practices Act, §§ 17–22A–1 through 17–22A–23, Ala.Code 1975, did not prohibit the taking or spending of excess campaign funds for personal use.[6] The majority's conclusion to the contrary, I believe, is erroneous.

The Alabama Fair Campaign Practices Act became effective July 1, 1988. It was the law in effect when the petitioner became the sole signatory of the "Cullman Friends" account. Section 17–22A–7, Ala.Code 1975, was modeled almost verbatim after the comparable federal statute found at 2 U.S.C. § 439(a). Both the Alabama statute and the federal statute specified certain uses to which excess campaign funds may be put and concluded by stating that they may also be used "for any other lawful purpose." The federal statute was amended in 1989 so as to qualify the "any other lawful purpose" language by specifically providing that "no such amounts may be converted by any person to any personal use, other than to defray any ordinary and necessary expenses incurred in connection with his or her duties as a holder of federal office." In May 1993, the Alabama legislature followed this same path, by amending § 17–22A–7 to add the following:

"Contributions to an office holder shall not be converted to personal use. For purposes of this section, personal use shall not include room, telephones, office expenses and equipment, housing rental, meals, and travel expenses incurred in connection with the duties as a holder of office."

By amending the two statutes, both the United States Congress and the Alabama Legislature tacitly admitted that the previous law did not forbid the personal use of excess campaign funds. Two attorney general opinions support the petitioner's interpretation of the Fair Campaign Practices Act in a manner that would allow personal use of campaign funds from the effective date of the Act until it was amended. In a 1990 opinion, the

6. Although some of the initial transfers of funds occurred during January and February 1987, when the old Corrupt Practices Act, §§ 17–22–1 through 17–22–15, Ala.Code 1975, was still in effect that may have prohibited personal use, the

statute of limitations would certainly bar any application of that Act in this case. The old Corrupt Practices Act had specific categories of things for which campaign funds could be spent.

attorney general, after quoting the language of § 17–22A–7 as it then read, stated:

"This provision specifically sets forth three ways in which excess funds may be lawfully used by a candidate and acknowledges that there may be other lawful ways in which the funds could be used.

"At present we are aware of one other way that funds may be used. The excess funds might be used as personal income by a candidate, but he should consult the Alabama Revenue Department and the Internal Revenue Service. There may be other lawful purposes that we are unaware of; however, they must be reviewed on a case-by-case basis as they are presented."

Opinion of the attorney general for the State of Alabama, 90–00134, to Perry A. Hand, secretary of state, April 16, 1990. In a 1991 opinion, Attorney General Jimmy Evans, who prosecuted this case, stated:

"In a prior Opinion, this office stated that this provision [§ 17–22A–7, Ala.Code 1975] specifically sets forth three ways that excess political contributions may lawfully be used and acknowledged that there may be other lawful purposes. Opinion to Hon. Perry A. Hand, Secretary of State, under date of April 16, 1990. We also stated that one of those lawful purposes may include using excess funds as personal income by a candidate, assuming that the candidate complies with all state and federal tax laws. If the Legislature did not intend for candidates to use campaign funds as personal income that could have been prohibited by specific language in the Act. Accordingly, while we do not condone a candidate's personal use of excess campaign funds, the Legislature has not made such use unlawful."

Opinion of the attorney general for the State of Alabama, 91–00196, to Melvin G. Cooper, March 20, 1991.

Although I do not agree with the petitioner that those two opinions should estop the State, I do believe that both opinions are legally correct and properly state the intent of the Legislature.

Several legislators have filed an amicus brief in which they argue for a construction of the language of § 17–22A–7 that would permit the personal use of excess campaign funds. They contend, as does the petitioner, that the Fair Campaign Practices Act, until it was amended in 1993, did not prohibit the personal use of excess campaign funds.

Based on the foregoing facts and especially based on (1) the fact that the Alabama Fair Campaign Practices Act was modeled after a federal statute that allowed personal use of campaign funds, (2) the fact that the Legislature later amended this section to specifically prohibit personal use of excess campaign funds, and (3) the interpretations in the attorney general opinions, I conclude that the Fair Campaign Practices Act did not prohibit the personal use of excess campaign funds and, therefore, that the trial court's instruction on the Fair Campaign Practices Act was reversible error. If the funds the petitioner used were not campaign funds, and the two appellate courts have found that they were not,[7] then the instruction regarding that Act amounted to an instruction to the jury to return a directed verdict.

Was the giving of the instruction harmless error? The State argues, and the majority of this Court states, that "Hunt should not be allowed to insert the issue of campaign funds into the trial and then complain that the trial judge instructed the jury on the law as it relates to that issue." 642 So.2d at 1066. Of course, the petitioner could not complain if the trial court had given the instruction that he requested, but does the fact that a defendant interjects a defense in a case mean he or she waives the right to object to an instruction on the defensive matter that is an incorrect statement of the law? I would think not. In fact, had the trial judge instructed the jury on the use of campaign funds as requested by the petitioner, even

---

7. The Court of Criminal Appeals found that "the funds in question in this case were solicited on behalf of a non-profit corporation, after Hunt had been elected, and so were not 'excess campaign funds.'" *Hunt v. State*, 642 So.2d 999, 1014 (Ala.Crim.App.1993). Likewise, the majority of this Court stated that "the facts show that the funds used by Hunt were not campaign funds, but that they were, instead, funds solicited by and contributed to a nonprofit charitable corporation." 642 So.2d at 1064.

the State's attorney recognizes what effect it might have had. In answer to one of my questions at oral argument relating to the instruction, he said:

> "An instruction that he asked for, Judge; he just didn't get the one he wanted. *He wanted the court to pardon him by giving an improper construction of that act.* What Judge Thomas did and what the Court of Criminal Appeals did was they read the Fair Campaign Practices Act and the Alabama Ethics Act *in pari materia.*"

(Emphasis added.) The State says that the petitioner did not get the instruction he wanted and suggests that he cannot claim error in the giving of an instruction on a defense he interjected into the case. I cannot accept the State's argument. The petitioner objected to the giving of the instruction and did all he could to prevent the jury from being improperly instructed, and, in view of the holding by the two appellate courts that, as a matter of law, the funds the petitioner used were not campaign funds, the giving of the incorrect instruction was even more harmful. Consequently, I cannot agree with the majority that the giving of the instruction, even if erroneous, was harmless under Rule 45, Ala.R.App.P.

Based on the foregoing, I must respectfully disagree with the majority on the two issues relating to the statute of limitations and the jury instruction on the Fair Campaign Practices Act. I hope that this belated opinion answers sufficiently the arguments made by the petitioner in his application for rehearing.